DRS. STEUER AND LATHAM, P.A., Rudolph R. Steuer, Jr., M.D. and Harry S. Latham, M.D., Plaintiffs,

v.

NATIONAL MEDICAL ENTERPRISES, INC. and NME Hospitals, Inc., Defendants.

Civ. A. No. 87–454–3.

United States District Court, D. South Carolina, Spartanburg Division.

Aug. 31, 1987.

John F. Beach and H. Fulton Ross, Jr., Ross & Beach, Gaffney, S.C., and Daryl G. Hawkins and A. Camden Lewis, Lewis, Babcock, Pleicones and Hawkins, Columbia, S.C., for plaintiffs.

Gary E. Clary, Hall, Daniel, Winter and Clary, Gaffney, S.C., and Robert Fabrikant, McKenna, Conner & Cuneo, Washington, D.C., for defendants.

## ORDER

GEORGE ROSS ANDERSON, Jr., District Judge.

This matter comes before the Court on defendants' motion for summary judgment on all Counts. The underlying lawsuit raises antitrust and other challenges to a July 1985 contract between Cherokee Memorial Hospital ("CMH") and Dr. Mijanovich (the "Mijanovich Contract") whereby Dr. Mijanovich became the exclusive pathology provider at CMH. The inception of the Mijanovich Contract brought to an end the plaintiffs' longstanding position as the sole pathology providers at CMH. Plaintiffs contend that in entering into and in implementing the Mijanovich Contract defendants have: engaged in a combination and conspiracy to unreasonably restrain trade,

an illegal tying arrangement and an illegal boycott in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, (Counts I, IIA, IIB and III); monopolized and/or attempted to or combined or conspired to monopolize trade in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, (Count IV); unlawfully deprived plaintiffs of their right to practice medicine in violation of 42 U.S.C. § 1983 (Count V); committed tortious interference with contract and tortious interference with prospective economic advantage (Count VI); violated the antitrust laws of the State of South Carolina, S.C.Code Ann. §§ 39–3–10; 39–3–130; 39–3–140, (Count VII); engaged in unfair methods of competition and unfair or deceptive acts or trade practices in violation of S.C.Code Ann. § 39–5–20 and the Federal Trade Commission Act, 15 U.S.C. § 45, (Count VIII); and committed breach of contract (Counts IX and X). Following the close of discovery, and after receiving substantial briefs and hearing oral argument from counsel for both parties, the Court has, for the reasons which follow, decided to grant defendants' Motion for Summary Judgment.

## I. FINDINGS OF FACT

1. Plaintiffs, Rudolph R. Steuer, Jr., M.D. ("Dr. Steuer") and Harry S. Latham, M.D. ("Dr. Latham"), are physicians engaged in the practice of pathology through a professional association called Drs. Steuer and Latham, P.A. (the "PA") (collectively referred to as "plaintiffs"). Amended Complaint ¶ 5.

2. National Medical Enterprises, Inc. ("NME") is a national health care corporation engaged in the hospital business through its subsidiary, N.M.E. Hospitals, Inc. ("NME Hospitals") (collectively referred to as "defendants").

3. CMH is a 162 bed acute care hospital located in Gaffney, South Carolina. Tidikis Dep. Tr. at 47.[1]

4. The Hospital building and grounds are owned by Cherokee County ("County"), a political subdivision of the State of South Carolina.

5. On January 3, 1984 the County and defendants entered into a General Agreement ("General Agreement"), (H–443 thru –459), whereby defendants agreed, *inter alia*, to construct and operate a new hospital in Gaffney to replace CMH, to lease, manage and operate CMH until such time as the new hospital was constructed, and to purchase the working capital, assets and personal properties used in connection with operating CMH.

6. Paragraph 7 of the General Agreement provided, *inter alia*, for the establishment of a Local Governing Board to be appointed by defendants, and for defendants to "regularly consult such board for advice with respect to any of the various policy issues and matters which both affect the community, and concern the operation of [CMH] and the new hospital and the services to be rendered by [defendants] thereunder.... However, [defendants] will have final authority and responsibility for all decisions relating to the management and operation of CMH and the new hospital."

7. After the General Agreement was executed, defendants assumed from the County full operational and managerial responsibility for CMH. Moran Dep. Tr. at 50; Medley Dep. Tr. at 53; D. Queen Dep. Tr. at 27–28.

8. CMH was a declining hospital prior to defendants obtaining control thereof, and defendants took "constructive action" after obtaining control of CMH. Latham Dep. Tr. at 186–187.

9. On February 3, 1984, the County and the defendants entered into a Lease Agreement ("Lease Agreement") (H–460 thru –490) to effectuate the General Agreement.

10. Section 3.1 of the Lease Agreement provides:

---

1. Throughout this Order and Memorandum the Court will reference the record by citing deposition transcripts and other documents used by the parties in discovery. Documents produced by the parties have been paginated in accordance with a designation identifying the party or individual providing the document.

LESSEE [defendants] acknowledges that, in addition to employees and contract physicians, the Hospital is served by a medical staff. LESSEE agrees to accept, on Commencement Date, all members of the medical staff in good standing on that date with the same privileges at Hospital, and to continue such privileges until their normal expiration date, provided they remain in good professional standing in accordance with medical staff rules, regulations and by-laws. It is the intent of the parties that the Hospital will have an open staff except for those departments traditionally served by contract physicians.

11. Section 8.1 of the Lease Agreement provides, in pertinent part:

LESSEE agrees to offer continued employment, at no reduction in salary or benefits, to all Hospital employees who are and remain in good standing and who desire to continue their employment with LESSEE.

12. Exhibit "B" to the Lease Agreement set out a "Schedule of Material Contracts to which [the County], or Hospital is a party or by which any of them is bound or will be bound as of the Commencement Date [of the Lease Agreement] and which affect or relate to the Leased Properties or the operation of the Hospital to the best of both parties' knowledge." Section 7.1 of Lease Agreement. [H–471, H–518 thru –520.] This schedule of Material Contracts lists, *inter alia*, "A pathology agreement with Harry S. Latham, M.D., dated July 1, 1983, terminating on a month to month basis." Item No. 15. [H–518 thru –520.]

13. Prior to defendants' assuming control of CMH, the County viewed plaintiffs as having contracted with the Hospital, not the County. D. Queen Dep. Tr. at 26.

14. Prior to February 1984 CMH had been operated under the auspices of the County. Moran Dep. Tr. at 48; Medley Dep. Tr. at 7–10; Tidikis Dep. Tr. at 15–16.

15. There is no evidence in the record that defendants share with the County any

profits or losses from the operation of CMH.

16. In March 1962, CMH entered into a Contract for Pathology Services with Dr. Steuer (the "Steuer Agreement"). [TM–172 thru –173.] The Steuer Agreement provided, *inter alia*,

1. The pathologist assumes the obligation as the Director of the Department in [CMH].

\* \* \* \* \* \*

3. The pathologist will assume the responsibility for the conduct of the Department of Pathology and will devote such time as is necessary to provide proper and adequate service.

\* \* \* \* \* \*

5. The professional income of the pathologist shall be determined by the following arrangement: the rate of compensation shall be 40% of gross billings for out-patients and in-patients of each case, certified charity excluded. Pathological fees will be collected by [CMH] in the name of the hospital. Financial settlement will be made between [CMH] and the pathologist on the calendar month of the first day of the succeeding month....

6. The pathologist shall have the right to set all laboratory and pathology fees.

\* \* \* \* \* \*

8. This agreement shall be for one year and shall be deemed to be automatically renewed unless terminated in writing by either party at least 120 days prior to the annual renewal date."

17. The Steuer Agreement was, in essence, renewed by the parties through August 1979, when it was amended to reflect the fact that (in 1976) Dr. Latham had joined Dr. Steuer in supplying pathology services at CMH and in managing CMH's Pathology Department. [TM–104 thru –108.][2]

18. The 1979 Amendment stated, in pertinent part that:

---

**2.** Prior to the 1979 Amendment the Steuer Agreement had been amended at least once, in

December 1970, to reduce the rate of compensation from 40% to 30% of gross billings.

1. The Pathologist shall provide for the proper functioning of all phases of the Pathology Department's activities.

\* \* \* \* \* \*

3. The Pathologist shall operate and conduct the Department of Pathology at Cherokee County Memorial Hospital ... providing fully the professional needs of [CMH] in a manner satisfactory to [CMH].

19. The 1979 Amendment also stated that the Pathologist "is at all times acting and performing as an independent contractor" (¶ 6),[3] reduced compensation from 30% to 25% of "gross monthly Clinical and Anatomical Pathology Charges," (¶ 7) and provided that the contract had a one year term "and shall be automatically renewed" unless written notice of termination shall be delivered within 120 days prior to the expiration of the agreement.

20. After the 1979 Amendment, the Steuer Agreement was further amended in 1981 to add Dr. Latham as a signatory (hereinafter the Steuer Agreement shall be denominated the "Steuer/Latham Agreement"), and to reduce the compensation rate to 19% of adjusted gross monthly Clinical and Anatomical Pathology charges. (TM–109–110)[4]

21. With the Steuer/Latham Agreement set to expire on July 31, 1984, CMH and plaintiffs extended that Agreement "so that said Agreement will expire on sixty (60) days written notice to either party by the other party," effective August 1, 1984. (TM–100–101.) (The "1984 Addendum").

22. On May 10, 1985, pursuant to the 1984 Addendum, CMH gave plaintiffs written notice that the Steuer/Latham Agreement would terminate within 60 days of plaintiffs' receipt of the notice. (TM–75.)

23. The non-renewal of the Steuer/Latham Agreement was communicated to plaintiffs in a manner which did not breach that Agreement. Steuer Dep. Tr. at 159.

24. Defendants had the absolute right not to renew the Steuer/Latham Agreement. Steuer Dep. Tr. at 159.

25. On July 15, 1985, defendants entered into a contract with Dr. Mijanovich, whereby he became the exclusive pathology provider at CMH. (JM–30 thru –43.)

26. The Mijanovich Contract is a one year contract, and is subject to termination by either party without cause upon 90 days written notice, and to termination for cause by CMH upon one day written notice. Paragraph 17 of the Mijanovich Contract provides that Dr. Mijanovich shall be compensated as follows: $113,900 for clinical laboratory and administrative services rendered, and Dr. Mijanovich "shall separately bill and collect for all patients for Anatomical Pathology and Clinical Pathology Services rendered." Exhibit "B" to Mijanovich Contract, (JM–42).

27. CMH has no economic interest in the professional fees generated by Dr. Mijanovich with respect to surgical/anatomical consults, for which he separately bills. Exhibit "B" to Mijanovich Contract (JM–42).

28. The terms and conditions set forth in the Mijanovich Contract were initially proposed by defendants to plaintiffs in May 1984, (TM–176, TM–178 thru –191), but were rejected by plaintiffs in June 1984 (TM–132 thru –144). Plaintiffs counterproposed that they receive $201,600 for all clinical laboratory and administrative services rendered. [TM–144.]

29. For the 23 years prior to defendants entering into the Mijanovich Contract, plaintiffs (and their designees) had been the sole pathology providers at CMH. Steuer Dep. tr. at 34–35.

3. Paragraph 11 of the 1979 Amendment further stated: "The Pathologist has entered into the contractual relationship with [CMH] to provide professional services and this does not imply that he is an employee of [CMH] or Cherokee County."

4. The Steuer/Latham Agreement was further amended in May 1983 to change the compensation formula as follows: the pathologists would receive 80% of gross monthly Anatomical Pathology charges, and 16% of adjusted gross monthly Clinical Lab Charges, (TM–113). In July 1983 the Steuer/Latham Agreement was further modified to reduce compensation to 13.5% of adjusted gross monthly clinical lab charges. (TM–114.)

30. In November 1984 the Joint Commission on the Accreditation of Hospitals ("JCAH") conducted a survey of CMH. The survey report (H–833–851), listed 18 deficiencies in the pathology department. CMH's receiving a three year accreditation was contingent upon its removing five of these deficiencies. JCAH also directed CMH to give high priority to an additional four of the deficiencies.

31. During the Steuer/Latham Agreement CMH's pathology department did not function in accordance with high professional standards. Steuer Dep. Tr. at 417.

32. The arrival of Dr. Mijanovich created competition with plaintiffs for the provision of pathology services that did not exist prior to the arrival of Dr. Mijanovich. Steuer Dep. Tr. at 99.

33. Plaintiffs never competed on the basis of price in providing pathology services under the Steuer/Latham Agreement. Steuer Dep. Tr. at 479–480.

34. Defendants' decision not to renew the Steuer/Latham Agreement was made solely by employees of defendants. Tidikis Dep. Tr. at 66; Moran Dep. Tr. at 56–57.

35. The County was neither consulted about nor did it otherwise influence, or seek to influence, defendants' decision whether to renew the Steuer/Latham Agreement or defendants' decision whether to enter into a pathology contract with pathologists other than plaintiffs. Medley Dep. Tr. 37, 53; Moran Dep. Tr. at 56–57.

36. The decision whether to renew the Steuer/Latham Agreement was solely within the purview of defendants. Steuer Dep. Tr. at 159.

37. The responsibility of determining whether, and if so, under what terms, to renew the Steuer/Latham Agreement was not within the purview of the CMH board of directors or medical staff. August 1, 1984 Addendum to Steuer/Latham Agreement [TM–100]; General Agreement § 7 [H–449]; Steuer Dep. Tr. at 668–670, 678.

38. Defendants are not, and have never been, parties to the Bylaws of the Medical Staff of CMH ("Bylaws"). Bylaws [Appendix B(1) to Defendants' Trial Brief.]

39. Defendants have never agreed to be bound by the Bylaws. Id.

40. The Bylaws deal with granting and revocation of medical staff privileges, not with whether a contract with a physician ought to be entered into or renewed. Id.

41. The Bylaws do not confer upon plaintiffs a right to have access to CMH's pathology department. Steuer Dep. Tr. at 726.

42. Defendants' non-renewal decision was based on a variety of business factors, including a determination that it was in the best interests of CMH and its patients that the Steuer/Latham Agreement be replaced with the Mijanovich Contract. Tidikis Dep. Tr. at 56–57; Moran Dep. Tr. at 32.

43. Defendants' decision not to renew the Steuer/Latham Agreement was not made for the purpose of obtaining a competitive advantage over, or inflicting competitive injury upon, the plaintiffs. Latham Dep. Tr. at 208–213; Steuer Dep. Tr. at 307–323.

44. The substitution of Dr. Mijanovich for plaintiffs as CMH's exclusive contract pathology provider has not resulted in an increase in price over competitive levels, or a diminution of quality. Steuer Dep. Tr. at 469–71; Barrett Dep. Tr. at 48, 92.

45. Certain members of CMH's board of directors and medical staff shared defendants' view that the interests of CMH and its patients would be best served by replacing plaintiffs as the contract pathologists at CMH, and they assisted defendants in their efforts to recruit a new contract pathologist. Moran Dep. Tr. at 56–58; 91–94. Steuer Dep. Tr. at 316–321.

46. None of the members of CMH's board of directors or its medical staff referenced in the preceding numbered paragraph compete with plaintiffs, and none of their conduct was intended to obtain a competitive advantage over or to inflict competitive injury upon plaintiffs. Steuer Dep. Tr. at 305–324.

47. Members of the Board of directors and medical staff entertained negative views about plaintiffs even before defend-

ants acquired control of CMH. Steuer Dep. Tr. at 312–13.

48. Dr. Mijanovich was completing his residency in Wisconsin at the time he filed an application with defendants' corporate headquarters in California seeking a contract to furnish pathology services. Mijanovich Dep. Tr. at 33–42.

49. At the time he submitted the above-referenced application to defendants, Dr. Mijanovich was pursuing potential employment opportunities throughout the United States. Mijanovich Dep. Tr. at 33–42.

50. At the time defendants were considering Dr. Mijanovich's application, they were considering entering into a contract with a pathologist from Florida to furnish pathology services at CMH. Latham Dep. Tr. at 205.

51. Hospitals recruit pathologists in a nationwide market. Steuer Dep. Tr. at 465–468.

52. The "exclusivity" provision in the Mijanovich Contract was inserted by defendants, and was not requested by Dr. Mijanovich. Mijanovich Dep. Tr. at 72–73.

53. Dr. Mijanovich did not exert any pressure on defendants to enter into a contract with him. Mijanovich Dep. Tr. at 37–43.

54. For 21 years, plaintiffs operated a pathology laboratory in an office housed in a building owned by Dr. Steuer located adjacent to CMH. Plaintiffs continue to operate this laboratory. Steuer Dep. Tr. at 13.

55. Plaintiffs have continued up to the present time to perform pathology work in their private, non-hospital-based laboratory adjacent to CMH even after the Steuer/Latham Agreement was not renewed. Steuer Dep. Tr. at 131.

56. Prior to Dr. Mijanovich's arrival at CMH, almost all of the physicians in Gaffney sent their office-generated clinical and surgical pathology work to pathology reference laboratories located outside of South Carolina. Very few of these physicians used the pathology facilities of CMH or plaintiffs' private laboratory for their office-generated specimens. Steuer Dep.

Tr. at 62–63; Mijanovich Dep. Tr. at 98–102.

57. After the arrival of Dr. Mijanovich, most of the physicians in Gaffney stopped using pathology reference laboratories located outside of South Carolina, and began using CMH's pathology facilities for their office-generated specimens. Mijanovich Dep. Tr. at 99–102.

58. In 1984, 38.8% of the residents of Cherokee County who were hospitalized were hospitalized in a hospital other than CMH; *see* Harris Affidavit at ¶ 24; in 1985, 40.4% of the residents of Cherokee County who were hospitalized were hospitalized in a hospital other than CMH. *Id.*

59. Twelve of CMH's staff physicians, who account for 42.1% of CMH's total admissions in Fiscal Year 1987, have staff privileges at hospitals other than CMH. Harris Affidavit at ¶ 38.

60. CMH perceives itself to be in competition with hospitals outside of Cherokee County, including hospitals in Spartanburg, Union, and Shelby. Watson Dep. Tr. at 8–9, 22; Barrett Dep. Tr. at 112.

61. CMH is perceived by consumers, and its staff physicians to be in competition with the hospitals referenced in the preceding paragraph. Hammett Dep. Tr. at 55–56. Johnson Dep. Tr. at 20; Gutta Dep. Tr. at 22–24; Watson Dep. Tr. at 8–9, 22; Steuer Dep. Tr. at 66–71.

62. In Fiscal Year ("FY") 1985 CMH's occupancy rate was 42.6%. Harris Affidavit at ¶ 37. In FY 1986 CMH's occupancy rate was 39.5%. *Id.* In FY 1987 CMH's occupancy rate was 32.1%. *Id.*

63. Consumers of hospital services in Cherokee County view hospitals located outside Cherokee County as good substitutes for the services offered by CMH. Johnson Dep. Tr. at 20; Watson Dep. Tr. at 8–9, 22.

64. Hospitals always arrange for the provision of pathology services to their patients. Steuer Dep. Tr. at 438–440.

65. A physician's decision whether to seek privileges at a particular hospital is not influenced by the identity of the pathol-

ogist at that hospital. Latham Dep. Tr. at 220.

66. Pathology services at CMH have always been furnished pursuant to a request by, or instruction from, the attending physician, not the patient. Steuer Dep. Tr. at 440.

67. Pathology services rendered to patients at CMH are always rendered in connection with the provision of hospital services. Steuer Dep. Tr. at 504–507.

68. Pathologists at CMH have only occasional face-to-face contact with patients receiving pathology services. Steuer Dep. Tr. at 464–465.

69. During the long life of the Steuer/Latham Agreement, a physician or patient rarely, if ever, requested the services of a specific pathologist, *i.e.*, Dr. Steuer or Dr. Latham. Steuer Dep. Tr. at 440–468; Latham Dep. Tr. at 219–220.

70. During their many years of service at CMH under the Steuer/Latham Agreement, plaintiffs spent most of their time at CMH in the pathology laboratories. Steuer Dep. Tr. at 440–468, 513.

71. Prior to and at the time of the nonrenewal of the Steuer/Latham Agreement plaintiffs had medical staff privileges at CMH. Steuer Dep. Tr. at 215.

72. Even after the Steuer/Latham Agreement was not renewed, plaintiffs' medical staff privileges at CMH remained intact. Steuer Dep. Tr. at 215.

73. Plaintiffs' medical staff privileges at CMH have remained intact up through the present time. Steuer Dep. Tr. at 215; Amended Complaint at ¶ 5.

74. After the arrival of Dr. Mijanovich, certain staff physicians at CMH requested that plaintiffs perform primary pathological consults. Moran Dep. Tr. at 165; Mijanovich Dep. Tr. at 27–29.

75. These requests were not made pursuant to any preexisting agreements, binding or otherwise, between said physicians and plaintiffs. Steuer Dep. Tr. at 715–724.

76. The staff physicians making these requests were not obligated to do so; these requests were strictly voluntary on the part of each said staff physician. Steuer Dep. Tr. at 715–724.

77. Plaintiffs were not obligated to accept these requests. Steuer Dep. Tr. at 716–724.

78. No physician on the medical staff at CMH ever promised plaintiffs that he (or she) would request that plaintiffs perform primary pathological consults. Steuer Dep. Tr. at 716–724.

79. No physician on the medical staff at CMH ever promised plaintiffs that he (or she) would request that plaintiffs perform primary pathology consults in the event that the Steuer/Latham Agreement was not renewed. Steuer Dep. Tr. at 716–724.

80. Plaintiffs never promised any physicians on the medical staff of CMH that they would perform primary pathology consults in the event the Steuer/Latham Agreement was not renewed. Steuer Dep. Tr. at 716–724.

81. After Dr. Mijanovich arrived at CMH, plaintiffs were, pursuant to the Mijanovich Contract, prohibited from using CMH's pathology laboratories and from performing primary pathology consults on specimens generated at CMH. Steuer Dep. Tr. at 683–684; Moran Dep. Tr. at 163–169; Tidikis Dep. Tr. at 102–106.

82. In order to offer pathology services at any hospital, it is necessary for the pathologist to have staff privileges as well as a contract with that hospital to provide pathology services. Steuer Dep. Tr. at 679, 681.

83. As a general rule, pathology services are not offered at a hospital by pathologists who are in competition with each other. Steuer Dep. Tr. at 251, 255–257.

84. As a general rule, it is more efficient for pathologists to furnish pathology services at a hospital in coordination, rather than in competition with each other. Latham Dep. Tr. at 36–37; Steuer Dep. Tr. at 252, 255–259.

85. As a general rule, it is more efficient for the pathology department of a hospital to be under the control of a single person. Steuer Dep. Tr. at 387.

86. The non-renewal of the Steuer/Latham Agreement did not affect the ability of plaintiffs to offer pathology services to any hospital other than CMH. Steuer Dep. Tr. at 469–471; 617; 619–621.

87. It is practical for plaintiffs to offer pathology services at hospitals other than CMH without changing their present residences. Steuer Dep. Tr. 707–08.

88. From 1966 up to the present, plaintiffs have had the sole contract to provide pathology services at Wallace Thompson Hospital in Union, South Carolina. Steuer Dep. Tr. at 34–35; 89–90.

89. Plaintiffs have continued to furnish pathology services at Wallace Thompson Hospital even after the Steuer/Latham Agreement was not renewed. Steuer Dep. Tr. at 132–33.

90. Plaintiffs have never competed with each other in providing pathology services at CMH or Wallace Thompson Hospital. Latham Dep. Tr. at 183.

91. Apart from their disinclination to compete with each other, nothing has prevented plaintiffs from competing with each other in furnishing pathology services at CMH or Wallace Thompson Hospital. Latham Dep. Tr. at 179.

92. The identity of a hospital's pathologist does not affect the hospital's ability to attract patients. Steuer Dep. Tr. at 502–03.

93. To the knowledge of all parties, with the possible exception of a single hospital in Arkansas, all hospitals in the United States require that pathology services be furnished in accordance with a contract between the pathologist and the hospital. Steuer Dep. Tr. at 696; Latham Dep. Tr. at 229–30.

94. To the knowledge of all parties, with the possible exception of a single hospital in Arkansas, no hospital in the United States has a contract with more than one pathologist or one group of pathologists to offer pathology services at that hospital. Steuer Dep. Tr. at 249–51; Latham Dep. Tr. at 229–30.

95. To the knowledge of all parties, with the possible exception of a single hospital in Arkansas, no hospital in the United States permits pathologists to furnish pathology services at a hospital in competition with each other. Steuer Dep. Tr. at 249–51; Latham Dep. Tr. at 229–30.

96. To the knowledge of all parties, with the possible exception of a single hospital in Arkansas, the relief requested here by plaintiffs is unique insofar as it would permit a pathologist or a group of pathologists to offer primary pathology services at a hospital despite the fact that said group does not have a pathology contract with that hospital. Steuer Dep. Tr. at 507–514, 696; Latham Dep. Tr. at 229–30.

97. Exclusive contracts with pathologists accrue significant advantages to hospitals generally; in particular, they promote "order" in the provision of pathology services. Steuer Dep. Tr. 580–591; 606–610.

## II. FINDINGS OF LAW

### A. *Federal Antitrust Claims*

At its core, plaintiffs' case amounts to a challenge to a unilateral decision by the administration of CMH to substitute Dr. Mijanovich—the hospital's current pathologist—for the plaintiffs, who together had been the long-standing sole providers of pathology services at the hospital prior to Dr. Mijanovich. For defendants' conduct to give rise to antitrust liability, plaintiffs must demonstrate that the hospital's decision to contract exclusively with Dr. Mijanovich resulted from an unlawful agreement, or that the hospital or Dr. Mijanovich has market power in a properly defined antitrust market. As a matter of law, neither such showing can be made in this case.

Plaintiffs do not challenge the legality of defendants' contract with Dr. Mijanovich. Instead, they argue only that the defendants' decision to require that all primary pathology services at the hospital be performed by Dr. Mijanovich is illegal because it unreasonably restrains competition in the rendering of primary pathology consults at the hospital. As will be shown below, plaintiffs' antitrust arguments have been

rejected recently by numerous courts, including the Supreme Court.

### 1. Standard for Summary Judgment

To prevail on a motion for summary judgment, the moving party must show that there are no genuine issues of material fact and that it is, therefore, entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c). Thereafter, the non-moving party "may not rest upon the mere allegations or denials of his pleading, but his response ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

The Supreme Court has recently described the non-moving party's burden in the context of alleged antitrust conspiracies as follows:

To survive [defendants'] motion for summary judgment, [plaintiffs] must establish that there is a genuine issue of material fact as to whether [defendants] entered into an illegal conspiracy that caused [plaintiffs] to suffer a cognizable injury. This showing has two components. First, [plaintiffs] must show more than a conspiracy in violation of the antitrust laws; they must show an injury to them resulting from the illegal conduct....

Second, the issue of fact must be 'genuine.' When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) (citations and footnotes omitted). The Court went on to observe that "if the factual context renders [plaintiff's] claim implausible—if the claim is one that simply makes no economic sense—[plaintiffs] must come forward with more persuasive evidence to support [their] claim than would otherwise be necessary." *Id.* at 1356. *Matsushita* and other recent Supreme Court cases.[5] Although this Court will, of course, adhere to the standards set forth in *Matsushita*, the Court wishes to emphasize that a different result would not obtain here even if the Court applied the more exacting pre-*Matsushita*,[6] standard.

---

5. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), a libel case, the Court held that a non-movant cannot sustain its burden if the evidence is merely colorable or is not sufficiently probative. *Id.* at 2511. Rather, the "trial judge must bear in mind the actual quantum and quality of proof" necessary for the plaintiff to succeed at trial. *Id.* at 2513. In short, "Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). *See also Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98 (4th Cir.1987) (discussed *infra*); *Huron Valley Hospital v. City of Pontiac*, 650 F.Supp. 1325 (E.D.Mich.1986) (once the movant has carried its burden of showing no genuine issue of material fact, the plaintiff is not relieved of its burden of producing in turn evidence which would support a jury verdict); *In re Airport Car Rental Antitrust Litigation*, 766 F.2d 1292, 1294 (9th Cir.1985) *cert. denied sub nom., Trans Rent–A–Car, Inc. v. Hertz Corp.*, —— U.S. ——,

106 S.Ct. 2248, 90 L.Ed.2d 694 (1986) (summary judgment appropriate in antitrust actions where there is no significant probative evidence tending to support the plaintiff's claims); *Smith v. Northern Michigan Hospitals, Inc.*, 703 F.2d 942, 947 (6th Cir.1983) (the plaintiff must produce "significant probative evidence" to meet its burden in opposing a summary judgment motion).

6. Although courts have been reluctant in the past to award summary judgment in antitrust cases, *see Poller v. Columbia Broadcasting System*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), the recent trend, even before *Matsushita*, has been that summary judgment is an important tool for dealing with antitrust cases. *See, e.g., First National Bank v. Cities Services Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed. 2d 569 (1968); *Ottensmeyer v. Chesapeake & Potomac Telephone Company of Maryland*, 756 F.2d 986 (4th Cir.1985) (summary judgment against plaintiff affirmed in Sherman § 1 case); *Stearns v. Genrad, Inc.*, 752 F.2d 942 (4th Cir. 1985) (summary judgment against plaintiff affirmed on claim of attempted monopolization); *Universal Lite Distributors, Inc. v. Northwest Industries, Inc.*, 602 F.2d 1173 (4th Cir.1979) (summary judgment against plaintiff affirmed on

### 2. *Antitrust Injury*

A threshold question in analyzing the antitrust implications of a business practice is whether it will lessen competition, not whether it harms a competitor. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) (The antitrust laws ... were enacted "for the protection of competition, not competitors.") Accordingly, for plaintiffs to prevail in an antitrust case, they must show more than the mere fact that they have suffered economic injury. Rather, they must establish that they have suffered antitrust injury, *i.e.*, injury of the type the "antitrust statute was intended to forestall," as a consequence of the complained of acts. *Associated General Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 540, 103 S.Ct. 897, 909, 74 L.Ed.2d 723 (1983); *Military Services Realty, Inc. v. Realty Consultants of Virginia, Ltd.*, 823 F.2d 829 (4th Cir.1987).

The Supreme Court has described antitrust injury as

[I]njury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anti-competitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations ... would be likely to cause.'

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (*quoting Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 125, 89 S.Ct. 1562, 1577, 23 L.Ed.2d 129 (1969). *See also Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982); *Associated General Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519,

103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The plaintiffs have failed to demonstrate any such injury in this case.

At the core of plaintiffs' complaint are allegations that the defendants have acted to restrain competition in the furnishing of medical/surgical hospital services and professional pathology services in Cherokee County. Amended Complaint at ¶¶ 32, 51. Since CMH is the only hospital in Cherokee County, plaintiffs are, in effect, alleging that CMH is the relevant market for this case. As discussed below, the provision of such services at CMH does not constitute a relevant market for antitrust purposes. Even if plaintiffs had established the existence of such a market, however, they nonetheless failed to demonstrate either the presence of competition within that "market" prior to the termination of their contract with CMH, or any lessening of such competition after that termination.

Plaintiffs' services to CMH were at all times provided pursuant to a contract with the hospital. At no time during the period that plaintiffs were the contract pathologists at CMH did the hospital contract with any other pathologists, nor do plaintiffs contend that they engaged in competition with any other pathologists at CMH at any time prior to the termination of their contract. Since that time, of course, Dr. Mijanovich has been the sole contract pathologist at the hospital. Thus, reduced to its essentials, plaintiffs' Amended Complaint rests not on any showing of lessened competition, but merely on the fact that they are disappointed competitors who must now provide their services elsewhere.

In *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), the Supreme Court confirmed that the mere fact that a disappointed competitor must practice elsewhere does not constitute "antitrust injury." In rejecting an antitrust challenge to a hospital's exclusive contract with a single

Sherman § 1 claim); *Apex Oil v. DiMauro*, 641 F.Supp. 1246, 1256 (S.D.N.Y.1986), *aff'd in part and rev'd in part*, 822 F.2d 246, 1987–1 Trade Cas. (CCH) ¶ 67,607 (2d Cir.1987) (summary judgment granted in favor of defendant in Sherman Act § 1 claims); *Savage v. Waste Management,*

*ment, Inc.*, 623 F.Supp. 1505, 1507 (D.S.C.1985) (summary judgment granted in favor of defendant in Sherman §§ 1 and 2 claims); *Kendall Elevator Co. v. LBC & W Associates*, 350 F.Supp. 75 (D.S.C.1972) (summary judgment granted in favor of defendant on Sherman § 1 claim).

group of anesthesiologists, the Supreme Court observed that

> It may well be true that the [exclusive] contract made it necessary for [plaintiff] and others to practice elsewhere.... But there has been no showing that the market as a whole has been affected at all by the contract.... There is simply no showing here of the kind of restraint on competition that is prohibited by the Sherman Act.

*Id.* 31–32, 104 S.Ct. at 1568.

■ For 23 years, plaintiffs had what amounted to an exclusive contract to provide pathology services at CMH.[7] In 1985, the hospital decided to contract instead with Dr. Mijanovich. Merely changing exclusive contractors, however, cannot constitute a violation of the antitrust laws. *Great Escape, Inc. v. Union City Body Co.,* 791 F.2d 532, 539–40 (7th Cir.1986); *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101 (7th Cir.1984), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985); *Trepel v. Pontiac Osteopathic Hospital,* 599 F.Supp. 1484, 1492 (E.D.Mich. 1984) *aff'd mem,* 780 F.2d 1023 (6th Cir. 1985); *Ace Beer Distributors, Inc. v. Kohn, Inc.,* 318 F.2d 283, 287 (6th Cir. 1963), *cert. denied,* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963). This is true despite the fact that substituting one exclusive contractor for another may have the consequence of "boycotting or shutting out" the displaced contractor. In *Barry v. Blue Cross of California,* 805 F.2d 866 (9th Cir.1986), plaintiffs argued that a Blue Cross plan had the consequence of boycotting or shutting out non-participating physicians by interfering with their access to

patients insured by the plan. The Ninth Circuit stated:

> We agree. However, every contract between a buyer and seller has precisely the effect of which the [plaintiffs] complain. When a buyer contracts with one seller, a second seller no longer has access to the buyer's business to the extent it is covered by the existing contract. This consequence, however, is not unlawful. The [plaintiffs] have confused an agreement to boycott with an agreement to buy and sell services.

*Id.* at 871.

■ In opposing defendants' Motion for Summary Judgment, the only injury to competition alleged by plaintiffs relates to a claim that prices for pathology services are higher than those charged by plaintiffs when they were the contract pathologists at CMH. Even assuming that this assertion were true, it would not establish injury to competition because the relevant inquiry is not whether prices have increased, but whether they have increased over the competitive level. Plaintiffs, however, failed to offer any evidence regarding competitive pricing levels. The only evidence in the record regarding price changes establishes that the pathology charges of defendants and Dr. Mijanovich were based on prices charged by their competitors. Barrett Dep. Tr. at 102–111, 172; Mijanovich Dep. Tr. at 171, 235, 252–260, 288.[8] Moreover, doctors who formerly sent their office-generated specimens to out-of-state reference laboratories have switched to CMH since the arrival of Dr. Mijanovich. The fact that consumers of pathology services have switched to, rather than away from, Dr.

---

**7.** Plaintiffs take the position that their contractual relationship with CMH was not exclusive. While the word "exclusive" did not appear in plaintiffs' contracts with CMH, those contracts unquestionably made plaintiffs responsible for fulfilling all of the hospital's professional pathology requirements. Plaintiffs' argument to the contrary is frivolous.

**8.** Mr. Barrett, manager of CMH's pathology laboratory, explained that the hospital had formerly used a single tier pricing structure that applied to both inpatient and outpatient pathology services. After the arrival of Dr. Mijanovich and Mr. Barrett, the hospital established a sepa-

rate outpatient price structure in order to compete more effectively with reference labs. Outpatient prices were therefore lowered and prices for inpatient pathology services were adjusted upward, but only to levels that were competitive with the other hospitals with which CMH competes in providing inpatient services.

> The overall effect was a better gross margin and we were not overpriced according to inpatient pricing with our surrounding admitting hospitals. We now offered much lower out-patient pricing—on a separate pricing schedule that they never had before.

Barrett Dep. Tr. at 110–111.

Mijanovich and CMH provides very compelling evidence that the prices charged since Dr. Mijanovich replaced the plaintiffs have not exceeded competitive levels.

3. *Applicability of the Rule of Reason*

Plaintiffs characterize defendants' exclusive contract with Dr. Mijanovich as a *per se* unlawful tying arrangement and a *per se* unlawful group boycott in violation of Section 1 of the Sherman Act. Amended Complaint at ¶¶ 40, 47, 49. As shown below, however, there is no basis for applying the *per se* rule to these facts, which means that the competitive effects of the actions of the defendants must be assessed in properly defined antitrust markets. When that is done, the conclusion that the defendants have not violated the antitrust laws is inescapable.

In determining whether an agreement unreasonably restrains trade, courts have employed two methods of analysis:

> In the first category are agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are illegal *per se.* In the second category are agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed.

*National Society of Professional Engineers v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978).

The *per se* rule is reserved for activities that "always or almost always tend to restrict competition and decrease output." *Broadcast Music, Inc. v. CBS,* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979). Although the Supreme Court has in the past stated that group boycotts are unlawful *per se, see United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Klor's Inc. v.*

*Broadway Hale–Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), in two more recent cases the Court has declined to apply the *per se* rule to horizontal boycotts. *FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 2017–18, 90 L.Ed.2d 445 (1986); *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985).

■ Similarly, with respect to the tying, a plaintiff must establish that the defendant "has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and [that] a not insubstantial amount of interstate commerce is affected." *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). As discussed above, in *Jefferson Parish v. Hyde,* the Supreme Court more recently explained that "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Hyde, supra,* 466 U.S. at 12, 104 S.Ct. at 1558; *Rockingham, supra.* Assessments of "sufficient economic power" or "control" with respect to the tying product are simply another way of saying that a showing of market power is necessary before liability may be found. Thus, absent a threshold showing of market power on the part of the defendants, the *per se* rule may not be invoked.[9]

■ Under the rule of reason, the plaintiff bears the burden of proving that the practice in question is unreasonable. *E.g., United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 374 n. 5, 87 S.Ct. 1856, 1863 n. 5, 18 L.Ed.2d 1249 (1967). The function of the court is to determine whether the al-

**9.** *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 678 F.2d 742, 745 (7th Cir.1982) ("A firm that has no market power is unlikely to adopt practices that disserve its consumers; it cannot afford to do so."); *see R.D. Imports Ryno Industries, Inc. v. Mazda Distributors (Gulf), Inc.,* 807 F.2d 1222 at 1225 (5th Cir.1987) ("Without market power, a competitor can do nothing to diminish competition"), *citing Northwest Power Products, Inc. v. Omark Industries, Inc.,* 576 F.2d 83 (5th Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979).

leged restraint "is one that promotes competition or one that suppresses competition." *National Society of Professional Engineers v. United States,* 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). That inquiry is limited to determining the "market impact" of the alleged restraint, *id.* at 691 n. 17, 98 S.Ct. at 1365 n. 17, which, in turn, requires that the impact of the practice in question be assessed in a properly defined relevant market. *See, e.g., Schwinn, supra* at 381–82, 87 S.Ct. at 1866–67; *Stearns v. Genrad, Inc.,* 564 F.Supp. 1309 (M.D.N.C.1983), *aff'd* 752 F.2d 942 (4th Cir.1984) (Rule of reason analysis requires examination of restraint on overall competition in the relevant market. The court is to focus on the preservation of competition and not on an individual competitor (citing *Brown Shoe Co. v. U.S.,* 370 U.S. 294, 330, 82 S.Ct. 1502, 1526, 8 L.Ed.2d 510 (1962)).

Even if a plaintiff succeeds in proving a restraint on competition in a relevant market, the restraint must also be shown to be "substantially adverse." *Schwinn, supra* at 375, 87 S.Ct. at 1863. Practices that produce only an "insignificant," "de minimis," "trivial," or "insubstantial" restriction of competition are not unlawful. *See United States v. Topco Associates, Inc.,* 405 U.S. 596, 606, 92 S.Ct. 1126, 1133, 31 L.Ed. 2d 515 (1972). *See also Harron v. United Hospital Center, Inc.,* 522 F.2d 1133 (4th Cir.1975), *cert. denied,* 424 U.S. 916, 96 S.Ct. 1116, 47 L.Ed.2d 321 (1976). In *Harron,* the plaintiff had been the exclusive radiologist at one of two Clarksburg, West Virginia hospitals. After a merger of the two hospitals, the board of directors entered into an exclusive contract with a competing radiologist to provide all initial radiology interpretations for the surviving hospital. The Fourth Circuit stated unequivocally: "it is frivolous to urge that the employment of a single doctor to operate the radiology department of a hospital invokes the Sherman Act and the civil rights statute pleaded." *Harron, supra,* 522 F.2d at 1134.

Plaintiffs' claims that the defendants have run afoul of the rule of reason can be disposed of by virtue of plaintiffs' failure to establish that the defendants have market power in a properly defined market.

Liability in antitrust law almost always requires proof of market power. This is because market power is an essential ingredient of injury to consumers. Market power means the ability to injure consumers by curtailing output and raising price; no possible injury, no market power; no market power, no violation; injury to consumers is therefore an essential ingredient of liability.

*Fishman v. Estate of Wirtz,* 807 F.2d 520, 568 (7th Cir.1986) (Easterbrook, J. dissenting in part).

As demonstrated below, there is no basis in the record for any finding of market power because there is insufficient evidence to support plaintiffs' purported market definitions. Moreover, plaintiffs have offered no evidence to refute defendants' contention—amply supported by *Collins v. Associated Pathologists, Ltd.,* 1987–1 Trade Cas. (CCH) ¶ 67,603 (C.D.Ill.1987) [Available on WESTLAW, 1987 WL 16947] —that proper market definition in this case must include examination of both the alternatives available to consumers of hospital services in Cherokee County and the alternatives available to pathologists seeking job opportunities at CMH.

Plaintiffs have advanced numerous antitrust arguments seeking to challenge defendants' exclusive contract with Dr. Mijanovich (the "Mijanovich contract"). Plaintiffs' principal argument is that the Mijanovich Contract violates Section One of the Sherman Act, 15 U.S.C. § 1, which renders unlawful any contract, combination or conspiracy in restraint of trade or commerce. Plaintiffs claim that the Mijanovich contract is a combination and conspiracy in restraint of trade (Count I), an illegal tying arrangement (Counts IIA and IIB) and an unlawful boycott (Count III). Although plaintiffs have not explicitly abandoned any of their claims under Section One, in their Memorandum opposing summary judgment and at oral argument plaintiffs emphasized almost exclusively their concern that the Mijanovich contract constituted an illegal

tying arrangement. Accordingly, this Court will deal first with that argument.

### 4. *Tying Arrangement*

■ In order to establish that an arrangement constitutes an illegal tying arrangement plaintiffs must demonstrate that the defendants have attempted to sell one product (the tying product) on the condition that the buyer also purchase a second product (the tied product), and that the defendants have "'sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product....'" *Rockingham, supra*, 820 F.2d at 103 (4th Cir. 1987), quoting *Northern Pacific Railway, Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

### (i) *Product Market*

Plaintiffs claim that the Mijanovich Contract constitutes an illegal tying arrangement in two respects: first, that CMH patients undergoing "surgical-type procedures in which tissue is removed from the body" must also "purchase a primary anatomical pathology consultation on that tissue from Dr. Mijanovich." Count IIA; and second, that CMH patients undergoing "medical/surgical procedures requiring clinical pathology consultations must "purchase a primary clinical consultation from Dr. Mijanovich." Count IIB. Plaintiffs claim that defendants have "sufficient economic power" in the "relevant market" for each of the tying products "to appreciably restrain free competition in the market" for each of the tied products." Count IIA and IIB. Plaintiffs further claim that defendants "participate in the revenues derived from [each of] the tied product[s]." *Id.* Finally, plaintiffs allege that the Mijanovich Contract constitutes a *"per se* unlawful tying arrangement." *Id.*

■ The Supreme Court has recently made clear that alleged tying arrangements should be adjudged under the *per se,* rather than the rule of reason, only when it is "probable" that defendants have "market power" in the market for the tying product. *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). The *Hyde* Court found that when the seller

> does not have either the degree or the kind of market power that enables him to force customers to purchase a second, unwanted product in order to obtain the tying product, an antitrust violation can be established only by evidence of an unreasonable restraint on competition in the relevant market.

*Id.* at 18, 104 S.Ct. at 1561. For the reasons outlined below, this Court finds that it would be inappropriate to invoke the *per se* test here because plaintiffs' allegations regarding market power and antitrust injury are "implausible." *Matsushita, supra*, 106 S.Ct. at 1356.[10]

In assessing plaintiffs' tying arguments under the rule of reason, the plaintiffs must first demonstrate the existence of two separate products. In *Hyde* the Supreme Court set forth the analytical framework for determining whether one or two products are involved in an alleged tying arrangement. This "turns not on the functional relation between them, but rather on the character of the demand for the two items." *Hyde, supra*, 466 U.S. at 19, 104 S.Ct. at 1562 (footnote omitted). The *Hyde* Court went on to emphasize that the critical issue was whether the products were "distinguishable in the eyes of buyers", and that the product markets must be analyzed "from the buyers perspective...." *Id.* Applying these guidelines to the instant case, it is clear that separate product markets, as alleged by plaintiffs do not, in fact, exist.

The Court notes at the outset that plaintiffs have offered no evidence to support

---

**10.** The Court also notes that in *Hyde* the Supreme Court did not apply the *per se* test in a factual setting analogous to the instant case, and that the Court there appears to have "substantially 'softened'" its position regarding strict application of the *per se* test. *Collins v. Associated Pathologists, Ltd.*, 1987–1 Trade Cas. (CCH) ¶ 67,603 at 60,618. The Court notes further that the Fourth Circuit recently did not apply a *per se* analysis in *Rockingham*, which also involved a fact pattern quite similar to that presented here.

their contention that separate product markets exist here. Likewise, plaintiffs have made virtually no effort to apply the *Hyde* formulation to demonstrate why the evidence in the record reveals the existence of separate product markets. Indeed, plaintiffs have failed to adduce evidence to enable a fact-finder to determine that each of the alleged tying products is, in fact, a product. First, plaintiffs have failed to identify the surgical-type procedures involving removal of tissue; nor does it appear from the record that surgical-type procedures involving removal of tissue are different in function or demand from any other surgical procedures offered at CMH. Second, plaintiffs have failed to offer evidence to enable a fact-finder to discern the existence of "a specific class of hospital medical/surgical procedures" requiring the utilization of clinical pathology consultations; the record does not indicate any reasoned basis for distinguishing between or among any of the numerous medical/surgical procedures which are performed at CMH or other hospitals. Finally, although there is a recognized difference between anatomical and clinical pathology, there is no evidence in the record which would support distinguishing between those two branches of pathology for purposes of this case.[11] Accordingly, the Court treats the two tying claims as a single tying claim and construes the alleged tying product to be inpatient hospital services, and the alleged tied product to be professional anatomical and clinical pathology.

■ There is, however, no evidence in the record which would warrant a finding that these alleged products constitute separate markets for purposes of this case. To the contrary, the uncontradicted evidence in the record establishes that professional pathology services are offered to hospital inpatients only in conjunction with the provision of inpatient hospital services, and that hospital patients consume professional pathology services only in conjunction with the consumption of hospital inpatient services. In short, the only record evidence regarding consumption of pathology services by hospital inpatients unequivocally demonstrates that there is no separate demand for professional pathology services by hospital inpatients.

The Court's conclusion that professional pathology services do not constitute a separate product from inpatient hospital services is reinforced by *Collins v. Associated Pathologists, Ltd.*, 1987–1 Trade Cas. (CCH) ¶ 67,603 at 60,609 (C.D.Ill. Feb. 11, 1987) [Available on WESTLAW, DCT database], which is virtually on all fours with the instant case. In *Collins*, the plaintiff, a pathologist, claimed that he was illegally prevented from practicing pathology at the defendant hospital (St. John's Hospital) where he had worked for eight years because his membership in the group, Associated Pathologists, Ltd. ("APL"), providing pathology services to the hospital had been terminated.[12] APL's relationship with St. John's had been governed by successive contracts, each of which contains a provision allowing termination at any time upon 90 days notice. Plaintiff joined APL in 1974. The employment contracts between the individual pathologists and APL were of one year duration subject to annual renewal. The directors of APL asked for and received plaintiff's resignation from the group, effective January 31, 1982.

**11.** Even assuming it were appropriate to make such a distinction, this would not change the Court's decision here because there is no evidence to support a finding that purchasers of inpatient hospital services viewed professional anatomical or clinical pathology services as being separate from the provision of inpatient hospital services. Moreover, to the extent that distinguishing between professional anatomical and clinical pathology is appropriate, the Court notes that plaintiffs have apparently abandoned their claims regarding clinical pathology. At this juncture plaintiffs appear to persist only in their arguments regarding anatomical pathology.

**12.** Although there was a factual dispute in *Collins* regarding whether the agreements between the pathology group and the hospital were, in fact, exclusive, the Court found that dispute not to be material to its decision. Rather, the Court concluded that the agreements at issue were not an unreasonable restraint of trade even if they did operate as exclusive contracts. *Collins, supra* at 60,612.

After leaving APL, plaintiff requested that St. John's hire him as a pathologist on an individual basis, but St. John's refused to do so. Plaintiff maintained staff privileges at St. John's on a leave of absence basis and was employed as a pathologist at a hospital in California. Subsequently, plaintiff filed a lawsuit alleging that the contract between APL and St. John's was a combination in restraint of trade, an unlawful boycott and an unlawful tying agreement in violation of Section 1 of the Sherman Act, and monopolization, attempted monopolization and conspiracy to monopolize in violation of Section 2 of the Sherman Act. Plaintiff also advanced several state antitrust and common law claims, including wrongful removal or reduction of staff privileges and tortious interference with staff privileges. In a thorough and well-reasoned opinion, the Court granted summary judgment for the defendants on all counts.

The plaintiff in *Collins* argued that the hospital had illegally tied hospital services and pathology services. In rejecting plaintiff's tying arguments the *Collins* Court focused on the statement in *Hyde* that "analysis of whether one or two products are involved in an alleged tying scheme 'turns not on the functional relation between them, but rather on *the character of the demand for the two items*.'" *Hyde, supra*, 466 U.S. at 19, 104 S.Ct. at 1562, (emphasis added). *Collins, supra* at 60,-618. Based on its review of the record, a record which is strikingly similar to the record here, the court "conclude[d] as a matter of law that the provision of pathological services is not a separate product from the other services routinely offered by a hospital." *Id.* at 60,619.

[T]he vast majority of work performed by pathologists involve laboratory tests and analyses that require the pathologist to rely a great deal upon the hospital's physical facilities and equipment. Thus, it is easy to see the pathologist as similar to an employee of the hospital rather than an independent contractor hired by the hospital for each specific task he must perform. The evidence shows that there is some demand for pathological services on an outpatient basis, not in connection with the provision of other hospital services, but the number of such requests are insubstantial when compared to the amount of pathological work done for hospital-based patients. In addition, the work of a pathologist is laboratory based, so there is not the close, face-to-face contact between the physician and the patient as there is in the practice of anesthesiology. Finally, the evidence is overwhelming that patients never request specific pathologists, and it is only on rare occasions that physicians themselves request the services of a specific pathologist....

....

Because pathologists are recognized as having a hospital-based practice rather than a practice oriented toward obtaining individual patients, the Court finds that pathological services are just one of the many services provided by a hospital for the care of its patients. The Plaintiff's claim of an unlawful tying arrangement between the Defendant Hospital and APL must fail on these Motions for Summary Judgment, because there are not separate and distinct products involved.

*Collins, supra,* at 60,619.

The record here contains uncontroverted evidence consistent with and supportive of the reasoning of the *Collins* Court.[13] Ac-

---

**13.** The *Collins* Court distinguished *Hyde*, wherein the Supreme Court, in rejecting an antitrust challenge to an exclusive contract between a hospital and an anesthesia provider, had nonetheless found that anesthesia services were a separate product from hospital services. The *Hyde* Court's analysis relied heavily on the fact that "patients or surgeons often request specific anesthesiologists to come to a hospital to provide anesthesia, and that the choice of an individual anesthesiologist separate from the choice of a hospital is particularly frequent in respondent's specialty, obstetric anesthesiology." *Hyde, supra,* 466 U.S. at 22, 104 S.Ct. at 1564 (footnote omitted). The record here, in contrast, contains no evidence that patients or their doctors request a specific pathologist. Moreover, the *Hyde* Court specifically recognized that anesthesiologists differ in material respects from "radiologists, pathologists and other types of hospital-based physicians." *Id.* at 23 n. 36, 104 S.Ct. at 1564 n. 36. Thus, while this Court

cordingly, the Court finds that professional pathology services are not a product separate from hospital services.

Even assuming that professional pathology services constituted a separate product, an illegal tying arrangement would not exist unless plaintiffs could prove that defendants had an economic interest in the tied product. The Court finds that although defendants do derive revenue from the sale of pathology services, it is undisputed that defendants do not share in the pathology fees earned by Dr. Mijanovich. In this respect the instant case is no different from *Rockingham* where a neurologist challenged a decision by a hospital to designate a certain group of radiologists as the official interpreters of all CT scans performed for patients of the hospital. In rejecting the allegation of that hospital CT scans had been illegally tied to professional CT scanning services, the Court found that

> [t]he hospital is not a competitor in the market for the tied product. It receives no part of the fee for interpreting the scans. In this respect the case differs from *Jefferson Parish* where the hospital and the anesthesiologists shared the fees for anesthesiological services.... The lack of the hospital's economic interest in the tied product is sufficient to defeat [the] tying claim under either theory that he presses.

*Rockingham, supra,* 820 F.2d at 104 (citing *Carl Sandburg Village Condominium Association No. 1 v. First Condominium Development Co.,* 758 F.2d 203, 207–08 (7th Cir.1985); *Miller Motors, Inc. v. Ford Motor Co.,* 252 F.2d 441, 446–47 (4th Cir. 1958); *ABA Antitrust Section, Antitrust Law Developments (Second) 75 (2d ed. 1984)* ).

Plaintiffs seek to distinguish *Rockingham* on two grounds: first, whereas in *Rockingham* "the defendants were not re-quiring the purchasers of medical/surgical hospital services to also purchase a CT scan", in the instant case "[w]ith certain limited exceptions, each patient who purchases a hospital surgical-type procedure in which tissue is removed from the body is required by hospital policy to also purchase an anatomical consultation performed by Dr. Mijanovich." Plaintiffs' Memorandum in Opposition to Summary Judgment ("Plaintiffs' Mem.") at 41.

Plaintiffs have mischaracterized both the holding in *Rockingham* and the facts disclosed by uncontroverted evidence in the record here. The *Rockingham* court rejected the argument that the hospital had exploited its alleged control over medical/surgical services because "[t]he hospital does not require each of its patients to undergo a [CT] scan. The patient's physician determines whether a scan is needed." *Rockingham, supra,* 820 F.2d at 104. Likewise, plaintiffs here concede that CMH "does not require each of its patients to purchase an anatomical consultation [whether or not performed by Dr. Mijanovich]. The patient's physician determines whether [an anatomical consultation] is needed." [14]

Plaintiffs next seek to distinguish *Rockingham* on the ground that "the plaintiff in *Rockingham* failed to establish ... that the hospital had an economic interest in the provision of CT scans.... [Whereas,] Cherokee Memorial Hospital has a direct unequivocal economic interest in anatomical consultations performed by Dr. Mijanovich. For in-patient procedures, the bill is split. The hospital and Dr. Mijanovich both directly bill the patient for their respective portion." Plaintiffs' Mem. at 42. Plaintiffs' factual claims miss the point of the holding in *Rockingham.* The finding in *Rockingham* that the hospital had no "economic interest in the interpretation of CT scans", 820 F.2d at 104, hinged on the fact

---

wholly adopts the framework of product market analysis espoused by *Hyde,* the product-specific conclusion in *Hyde* that *anesthesia* services are a separate product from hospital services is of no probative value in determining whether pathology services are a separate product market from hospital services.

14. Patients' physicians choose what procedures a patient needs. Mijanovich Dep. Tr. at 146. This fact is conceded by plaintiffs. Plaintiffs' Mem. at 3. Moreover, plaintiffs do not contend that physicians or their patients are forced to purchase medically unnecessary or inappropriate pathology consults.

that the hospital "receives no part of the fee for interpreting the scans", *id.* and on the fact that the "hospital receives no part of the radiologists fees." *Id.* at 100.

■ As in *Rockingham*, CMH "receives no part of [Dr. Mijanovich's] fees." Mijanovich Dep. Tr. at 117–120. Likewise, CMH has no input or control over the professional fees set by Dr. Mijanovich for performing primary anatomical consults. These fees are set solely by Dr. Mijanovich and billed directly by him to in-patients (or their payors) as a "professional component." Mijanovich Dep. Tr. at 117–120; Barrett Dep. Tr. at 20–24, 35–41.[15] The only revenues derived by CMH from primary anatomical consults relate to the "technical component" which CMH bills directly to its patients (or their payors). The "technical component" relates to the use of the materials and equipment in CMH's pathology department, and has no relationship whatsoever to Dr. Mijanovich's professional fee. Thus, contrary to plaintiffs' assertions, CMH has no economic interest in the tied product, *i.e.*, the professional fees of Dr. Mijanovich.

Plaintiffs' also argue that "the defendants in this case do sell the technical component of anatomical surgical consults and in that sense share profits with Dr. Mijanovich in the sale of those services." Plaintiffs' Supp. Mem. at 52. Plaintiffs' argument reflects a basic misunderstanding of their antitrust theory of this case. Plaintiffs' principal antitrust contention is that CMH

> is an 'essential facility' for the practice of pathology in Cherokee County, South Carolina. That is, a physician who specializes in pathology must have access to the equipment owned and/or controlled by the hospital in order to practice his profession. If Cherokee Memorial Hospital is allowed to retain an exclusive contract pathologist and deny access to its pathology equipment for other qualified physicians, including the Plaintiffs, the result will be a restraint on free trade in the market for the provision of hospital services and professional pathology services in the relevant geographic market.

Amended Complaint at ¶ 30. Thus, plaintiffs are not complaining about the fact that CMH's equipment is used to furnish pathology services; instead, plaintiffs complain about their being denied *access* to that equipment because denial of access deprives them of the ability to earn professional fees. Thus, the tied product is the professional fees earned by the contract pathologist, *not* the technical fees earned by the hospital. Moreover, there is no evidence in the record that furnishes CMH or Dr. Mijanovich with power to raise prices above competitive levels. *See* discussion, *infra*, re: injury to competition.

(ii) *Geographic Market*

■ Even assuming that there is a separate tied product, and that defendants

---

**15.** The *Rockingham* court distinguished *Hyde*, "where the hospital and the anesthesiologists shared the fees for anesthesiological services." 820 F.2d at 104, citing *Hyde*, 466 U.S. at 6 n. 4, 104 S.Ct. at 1555 n. 4, where the *Hyde* Court noted that "[t]he fees for anesthesiological services are billed separately to the patients by the hospital. They cover the hospital's costs and the professional services provided by [the exclusive anesthesia contractor]. After a deduction of eight percent to provide a reserve for uncollectible accounts, the fees are divided equally between [the exclusive anesthesia contractor] and the hospital." The situation described in *Hyde* is virtually identical to the billing and revenue arrangements which existed between CMH and plaintiffs with respect to anatomical consults prior to July 1, 1983, when the Department of Health and Human Services promulgated a regulation requiring pathologists to bill patients directly for primary anatomical consults.

Steuer Dep. Tr. at 197. This regulation resulted in an Addendum and Amendment to the Steuer/Latham Agreement which provided, that with respect to Anatomical Pathology Charges "the Pathologist shall bill the patient directly for professional services in the name of the pathologist.... The Hospital shall bill to the patient for technical services provided by the Hospital." July 1, 1983 Addendum and Agreement [to Steuer/Latham Agreement], TM–114. Dr. Steuer's testimony regarding the origin of separate billing for professional services is also useful in considering plaintiffs' remarkable (and entirely unsupported) contention that "[s]plitting the bill into two components is merely an attempt to violate the antitrust laws in an indirect, rather than direct, manner. Plaintiffs' Mem. at 11–12. This policy was adopted by the hospital and agreed to by plaintiffs in mid–1983 —well before defendants assumed control of CMH.

have an economic interest in that product, in order to establish an illegal tying arrangement plaintiffs would have to demonstrate that defendants have market power in the tying product, *i.e.,* hospital services. Market power cannot be assessed in a vacuum. Instead, the existence of a properly defined antitrust market is a prerequisite to determining the existence of market power. A relevant antitrust market has two distinct, but related, elements: (1) a relevant product market, and (2) a relevant geographic market.[16] *E.g., Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). In determining whether a given product and a given geographic area constitute a relevant antitrust market it is necessary to determine whether market power can be exercised with respect to that product within that area. In order to make that determination it is necessary to evaluate both the probable demand response of consumers and the probable supply responses of other firms, in the event that a single firm or a group of firms sought to exercise market power by raising prices above competitive levels.

The first component of the relevant antitrust market, the product market, includes reasonably interchangeable services or products, that is, products or services which may be substitutes for the identical products or services in question, but only if such substitutes are actually competitive with the products or services in question.[17] For purposes of deciding the present motion the Court will assume the correctness of plaintiffs' assertion that the relevant product is hospital services.

██ The second component of the relevant antitrust market, the geographic market, is that geographic area in which there is effective competition in the sale and distribution of particular products or services, and in which persons or entities actually do, or potentially may, compete in the conduct of their business operations. "The definition of a relevant geographic market varies from case to case depending on the type of product and the geographical characteristics of an area, but the relevant geographic market must identify the area of effective competition that the defendant encounters when it offers its product or service for sale." *Collins, supra,* at 60,620, *citing Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). In other words, the relevant market is that area of effective competition within which defendants operate. It must correspond to commercial realities. It is the geographic area in which a purchaser can practically turn for products or services.

Plaintiffs assert that the relevant geographic market "is mostly within Cherokee County, South Carolina and specifically covers a 10 to 20 mile radius of the hospital.",[18] Amended Complaint at ¶ 15. This assertion appears to hinge on the fact that "CMH is the only hospital in Cherokee County and as such is in a dominant market position." *Id.* Plaintiffs also rely on the fact that the majority, *i.e.,* 60%, of the residents of Cherokee County are hospitalized at CMH. As will be shown below, plaintiffs' asserted relevant geographic market reflects their preference for performing pathology services at the only hospital in the county (CMH), and does not reflect "commercial reality," *i.e.,* it ignores the perspective of consumers (*i.e.,* patients, physicians, the hospital and third-party payors). Steuer Dep. Tr. at 620–621.[19]

**16.** A relevant antitrust market has also been defined as "a product or group of products and a geographical area in which it is sold such that a hypothetical, profit-maximizing firm ... that was the only present and future seller of those products in that area "could profitably raise prices above competitive levels for a significant period of time." Department of Justice 1984 Merger Guidelines, 49 Fed.Reg. 26,824–826 (1984).

**17.** *See* Department of Justice 1984 Merger Guidelines, 49 Fed.Reg. 26,824 (1984).

**18.** Plaintiffs offered no indication of the precise contours of this radius. It is clear, however, that the area included within the 20–mile radius of CMH extends well beyond the boundaries of Cherokee County, reaching into both North Carolina and Spartanburg.

**19.** "The Plaintiff's personal preference to continue his practice at [a particular hospital] does not justify excluding another area hospital from the 'relevant' geographical market.'" *Kuck v. Bensen,* 647 F.Supp. 743, 746 (D.Me.1986) (up-

■ Plaintiffs' claim that Cherokee County constitutes a relevant geographic market is facially defective because it equates CMH's service area with a geographic market for antitrust purposes. In order to convert a "service area" into a geographic market it is necessary to offer evidence regarding elasticity of demand and barriers to entry. Absent such evidence, which plaintiffs have the burden of introducing,[20] there is no basis for inferring that a service area constitutes a geographic market, or that the patient origin data pertinent to that service area constitute "market share" information. Thus, the fact that 60% of Cherokee County's residents are hospitalized at CMH does not mean that CMH has a 60% market share. In order to conclude that CMH has a 60% *market share* it must first be determined that the service area does, in fact, constitute an antitrust market.

The Federal Trade Commission has recently confirmed that the boundaries of a relevant geographic market in the context of the hospital industry depend upon barriers to entry and the ability of consumers to switch to other hospitals.

> Because we are concerned only with an area in which competition could be harmed, the relevant geographic market must be broad enough that buyers would be unable to switch to alternative sellers in sufficient numbers to defeat an exercise of market power by firms in the area.... If an exercise of market power could be defeated by the entry of products produced in another area, both areas should be considered part of the same geographic market ..., since competition could not be harmed in the smaller area....
>
> Looking at a "static" snapshot of a market is thus insufficient in itself.... Rather, evidence of current market behavior must be viewed in a 'dynamic' framework that considers the possible competitive responses of firms outside the current market area to anticompetitive behavior of firms within.

*In the Matter of Hospital Corporation of America*, 106 FTC 361, 466 (1985), *aff'd. Hospital Corporation of America v. FTC*, 807 F.2d 1381 (7th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1975, 95 L.Ed.2d 815 (1987).

The "dynamic" analysis described by the Commission is at the heart of antitrust analysis; it is central to the concept of market definition.[21] The "dynamic" analysis hinges on the adducing of evidence of elasticity of demand and barriers to entry. In the absence of such evidence it simply is not possible to infer whether a service area constitutes a geographic market for antitrust purposes.[22]

holding exclusive contract between hospital and emergency room physician).

20. *E.g., Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490 (4th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 2182, 95 L.Ed.2d 838 (1987).

21. The Fourth Circuit has used similar language in describing geographic market definition: "The geographic market should consist of *an area in which the defendants operate and which the plaintiff can reasonably turn to for supplies.*" ... The penultimate question, towards which this preliminary inquiry into market definition is directed, is whether the defendant has market power: the ability to raise prices above levels that would exist in a perfectly competitive market. The geographic market demarcation should not be too tightly drawn, unless clear evidence exists that potential competitors outside the region are hindered from entering. A market drawn too tightly, either in geographic terms that exclude potential suppliers or in product terms that exclude potential substitutes, creates the illusion of market power where none may exist."
*Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 495 (4th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 2182, 95 L.Ed.2d 838 (1987) (footnote and citations omitted), quoting *RCM Supply Co. v. Hunter Douglas, Inc.*, 686 F.2d 1074, 1077 (4th Cir.1982) (emphasis in original).

22. *See, e.g., Syufy Enterprises v. American Multicinema, Inc.*, 793 F.2d 990, 995 (9th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 876, 93 L.Ed.2d 830 (1977) ("neither the Supreme Court nor any other court has ever decided whether a market share as low as 60–69% is sufficient standing alone to sustain ... a finding [of market power]"); *Ball Memorial Hospital, Inc. v. Mutual Hospital Ins., Inc.*, 784 F.2d 1325, 1336–37 (7th Cir.1986) (80% market share insufficient to establish market power where no barriers to entry); *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 671–72 & n. 3 (7th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1659, 90 L.Ed.2d

In the present case, plaintiffs have failed to offer any evidence regarding elasticity of demand and entry barriers. The only record evidence on those issues was adduced by defendants in the form of expert testimony [23] that CMH's service area, is *not* a relevant geographic area for antitrust purposes because residents of Cherokee County can, and do, "readily obtain elsewhere" [24] hospital services. Plaintiffs' failure to offer evidence on these issues,[25] or to controvert defendants' evidence, precludes plaintiffs from establishing the parameters of the geographic market relevant to this case.

In any event, the Court has concluded not only that plaintiffs have failed to adduce evidence sufficient to support their alleged geographic market, but also that the evidence in the record affirmatively demonstrates that the relevant geographic market is larger than Cherokee County. Approximately 40% of the residents of Cherokee County who were hospitalized used hospitals other than CMH, *i.e.*, hospitals outside the county. The out-of-county hospitals used most by Cherokee County residents were those located in Spartanburg, although a considerable number of patients also chose hospitals in North Carolina. Harris Affidavit at ¶ 24. Moreover, there are seven hospitals within 26 miles or 31 minutes driving time of CMH. Harris Affidavit at ¶ 29.[26] In short,

---

201 (1986) (the focus in determining market power should be on barriers to entry as well as on market share); *Cowley v. Braden Indus., Inc.,* 613 F.2d 751, 753–55 (9th Cir.) *cert. denied,* 446 U.S. 965, 100 S.Ct. 2942, 64 L.Ed.2d 824 (1980) (no evidence of harm to competition despite 70% market share); Landes & Posner, *Market Power in Antitrust Cases,* 94 Harv.L.Rev. 937, 950–51 (1981) (even an 80% market share can be too little to establish market power if, for example, there are insignificant barriers to entry).

Plaintiffs seek to circumvent their failure to adduce record evidence of barriers to entry by arguing that there are "significant" barriers to entering the acute care hospital market in Gaffney. Plaintiffs' Mem. at 36–37. The "barriers" inaccurately identified by plaintiffs relate solely to constructing a hospital in Cherokee County, *not* to the ability of hospitals outside the County to offer services to county residents. Plaintiffs' inexplicably ignore the fact that in order to sell hospital services to county residents it is not necessary for a hospital to be located in the County. This is evidenced by the fact that hospitals outside the County presently sell their services to over 40% of the residents of the County. Plaintiffs are, in any event, wrong in claiming that one of the barriers to entry is "that in order for a new hospital to enter the Cherokee County market it must first obtain a certificate of need from the County itself." Plaintiffs' Mem. at 37. In fact, the state, not the County, awards certificates of need, and these certificates are necessary only to construct a facility, not to offer services to residents of a county different from that in which the hospital is located. Department of Health and Environmental Control, Regulation 61–15. Thus, for example, Spartanburg hospitals do not require certificates of need to offer their services to Cherokee County residents. Plaintiffs also claim that there are "significant economic barriers to entry in the market." Plaintiffs'

Mem. at 37. This conclusory assertion is made without reference to the record, and, in fact, there is no record evidence to support it.

23. Defendants' expert testimony was tendered to the Court in an Affidavit by Dr. Barry Harris which accompanied their memorandum in support of summary judgment. Dr. Harris is an industrial organization economist who has testified frequently in hospital and other antitrust cases. Plaintiffs have not challenged Dr. Harris' qualifications.

24. *Hyde, supra.* 466 U.S. at 25 n. 40, 104 S.Ct. at 1565 n. 4.

25. Plaintiffs have declined to offer expert testimony on market definition issues. Plaintiffs apparently believe that expert testimony is not necessary to address these issues despite the fact that when Dr. Steuer was asked his understanding of the tying and tied products alleged in paragraph 38 of his Complaint, he responded: "Well, I'm glad you asked that, because I don't understand it at all." Steuer Dep. Tr. at 712. Failure to adduce expert testimony on competitive issues such as market definition augurs strongly in favor of granting summary judgment against an antitrust plaintiff. *See, e.g., Military Services Realty Inc. v. Realty Consultants of Virginia,* 823 F.2d 829 (4th Cir.1987, C.A.4); *Forro Precision, Inc. v. IBM,* 673 F.2d 1045, 1058–1059 (9th Cir.1982) (rejecting plaintiff's claim that defendant possessed market power because, in part, plaintiff failed to produce expert testimony to interpret market share information; "without the benefit of expert testimony or other credible evidence to support an inference of market power from the list of companies and market share, any such inference [of market power] would be sheer speculation.")

26. It should be noted that these driving times (based on the most direct route at speeds at or

a hospital market that includes CMH must, at a minimum, also include hospitals in Spartanburg County, and probably includes some or all of the nearby hospitals in North Carolina. This conclusion is confirmed by the testimony of numerous other witnesses. For example, Dr. Steuer—one of the plaintiffs—testified to his belief that CMH

> competes with the ones that are nearest to us, which are Spartanburg General, Doctors Memorial, Mary Black [all in Spartanburg], Cleveland Memorial [in Shelby, N.C.], Gaston Memorial [in Gastonia, N.C.], and York General [now known as Piedmont Medical Center, in York County], and possibly, even Divine Saviour [in York County, S.C.] and possibly, even Union [Wallace Thompson Hospital in Union, S.C.]

Steuer Dep. Tr. at 67. Dr. Steuer also testified that Mary Black Hospital, in particular, has taken "a lot of patients away from Cherokee Memorial," and that CMH is "a very weak hospital." *Id.* at 68. Similarly, Dr. Gutta, a urologist on the staff of CMH and Mary Black Hospital testified that he considered hospitals in Shelby, Spartanburg, York County and even Charlotte to be in competition with CMH. Gutta Dep. Tr. at 25–26. Dr. Hammett, a long-standing general practitioner in Gaffney, also testified that many residents of Cherokee County choose to be hospitalized in Spartanburg. More specifically, Dr. Hammett testified that CMH may "dominate" Cherokee County in the sense that it offers the only hospital facilities within the borders of the county "but now, with transportation what it is, people can drive to Spartanburg almost as easily that they can go across this town [Gaffney] at 5 p.m." Hammett Dep. Tr. at 55–56.

The fact that hospitals located in Spartanburg, at least, are recognized as attractive alternatives to Cherokee Memorial for residents of Cherokee County is also confirmed by the testimony of George Johnson, Vice–President of Corporate Communi-

cations of Blue Cross and Blue Shield of South Carolina ("Blue Cross"). Blue Cross currently provides health insurance to approximately 40% of the people in South Carolina who are eligible for non-government insurance. Johnson Dep. Tr. at 10. As such, Blue Cross is a major purchaser of hospital services on behalf of its clients, most of whom are employers who, in turn, offer Blue Cross to their employees. *Id.* at 10–11.

Recently, Blue Cross began marketing a preferred provider organization ("PPO") in Cherokee County. A PPO is a means of health insurance whereby the insurance company contracts with a network of health care providers, including hospitals. The insurer attempts to negotiate favorable rates of reimbursement for the cost of health care that reflect the volume of patients the insurer expects to deliver to the preferred health care provider. The insurer then passes through some of this cost savings to subscribers in the form of lower co-payments and reduced deductibles, which creates the incentive for the patient to use the preferred providers and, in turn, creates the volume to support the "discount." *Id.* at 11–15.

Mr. Johnson explained that one of the principal criteria used by Blue Cross in identifying those hospitals with which it will seek to negotiate a preferred provider contract is the geographic accessibility of the hospital to potential subscribers. *Id.* at 16. Thus, to be involved in a PPO, a hospital must offer certain basic services, *e.g.*, obstetrics and an emergency room, and it must be within a distance that people are willing to travel for their hospital needs. *Id.* at 21. For purposes of the PPO presently being marketed to employers in Cherokee County, the hospital with which Blue Cross has negotiated preferred provider status is Mary Black in Spartanburg. *Id.* at 18. In preparation for negotiating with Mary Black Hospital, Blue Cross contacted representatives of employers in Cherokee

below the posted speed limits) represent the *maximum* distance a patient from Cherokee County would need to travel to use a hospital other than Cherokee Memorial. Thus, a patient residing mid-way between Cherokee Memorial

and the hospitals in Spartanburg, for example, would not have to drive any additional distance from his residence to use a hospital other than Cherokee Memorial.

County to determine whether their employees would "have a problem with a hospital in Spartanburg County." *Id.* at 19. To the knowledge of Mr. Johnson

> there has been no stated or perceived resistance to using a preferred hospital in Spartanburg County. It's a general feeling that a lot of people in Cherokee County already use hospitals outside the county.

*Id.*

Accordingly, there can be no doubt that the geographic market in which CMH competes must include at least the hospitals in Spartanburg. Those hospitals are perceived as attractive alternatives to CMH by physicians, third party payors and above all by patients, who "vote with their feet" by leaving the county in large numbers when they require hospitalization. Among the effects of this "outmigration" from Cherokee County is a declining census at CMH, which has been operating at substantially less than 50% of its capacity in terms of occupancy. Harris Affidavit at ¶ 17. It defies credulity to suggest, as plaintiffs have, that a hospital with a substantial majority of its beds empty is somehow exploiting market power.

The case law likewise makes clear that plaintiffs' claim that the relevant antitrust market consists of a single hospital is patently absurd. As in *Collins* and *Dos Santos v. Columbus–Cuneo–Cabrini Medical Center*, 684 F.2d 1346 (7th Cir.1982) both of which involved an antitrust challenge to an exclusive contract between hospitals and hospital-based physicians. " '[W]e have reason to doubt whether the relevant markets can be sliced so small as to embrace only a single hospital.' " *Collins, supra,* at 60,620, quoting *Dos Santos, supra,* 684 F.2d at 1353. *See Seidenstein v. National Medical Enterprises, Inc.*, 769 F.2d 1100 (5th Cir.1985) (rejecting the contention that invasive cardiology at a single hospital was an antitrust market, even though defendant hospital controlled 100% of the market).[27]

When market shares for more properly defined hospital markets are calculated, CMH can be seen in true perspective. Far from the "dominance" alleged, but not substantiated, by plaintiffs, CMH's share of a market including the hospitals in Spartanburg varies from approximately 10% to 15%, depending upon whether market shares are measured by licensed beds, patient days or admissions. Harris Affidavit at ¶ 31. Moreover, even those shares probably overstate the hospital's role in the market because it is likely that a properly defined market should include the three nearby North Carolina hospitals (Crawley Memorial (Boiling Springs, N.C.), Kings Mountain Memorial Hospital (Kings Mountain, N.C.) and Cleveland Memorial Hospital (Shelby, N.C.). When these hospitals are included, CMH's market share is between 7.5% and 10.7%. Harris Affidavit at ¶ 33.

In sum, CMH's low shares in these markets, along with its steadily declining occupancy rates, *id.* at ¶ 37, and the excess capacity at competing hospitals demonstrate that CMH has no market power and thus has neither the incentive nor the ability to reduce competition in any properly defined market for hospital services. Any

---

27. The courts have routinely rejected single facility markets in numerous other industries. *E.g., R.D. Imports Ryno Industries, Inc. v. Mazda Distributors (Gulf), Inc.*, 807 F.2d 1222 (5th Cir. 1987) (rejecting product market consisting only of two Mazda model-lines, and adopting product market which includes all foreign and domestic automobiles which competed with Mazda products). *See also United States v. E.I. Du Pont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) (holding that a manufacturer's monopoly over the distribution of its own product is not illegal); and *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480 (5th Cir.1984) (rejecting the contention that Holiday Inn hotel rooms, as opposed to hotel rooms generally, in downtown New Orleans constitute an antitrust market). As the Fifth Circuit stated recently: "[w]hile the question of relevant market is usually one of fact for the jury, the relevant market may in some instances be determined as a matter of law.... [O]ne purchaser in a market of competing purchasers cannot constitute a relevant geographic market, absent exceptional market conditions." *Jayco Systems, Inc. v. Savin Business Machines Corp.*, 777 F.2d 306, 319 n. 43 (5th Cir.1985), *cert. denied,* — U.S. —, 107 S.Ct. 73, 93 L.Ed.2d 30 (1986).

attempt by CMH to engage in anticompetitive conduct would only cause additional patients to be lost to competing hospitals. *Id.* at ¶ 33. This simply confirms that the geographic market alleged by plaintiffs is not correct. For the reasons discussed above, the Court finds that the Mijanovich Contract does not constitute an illegal tying arrangement.

### 5. *Exclusive Dealing*

■ Plaintiffs also challenge the Mijanovich Contract on the ground that it constitutes an illegal exclusive dealing arrangement.[28] Exclusive dealing arrangements are analyzed under the rule of reason, and the inquiry focuses on whether the arrangement forecloses competition among producers or suppliers in a substantial share of the affected market. This

> involves determining the type of goods involved and the market area in which the seller operates and within which the purchaser can practically turn for supplies. The last step in this analysis is a determination of whether the competition foreclosed by the contract constitutes a substantial share of the relevant market, that is, whether the opportunities for other traders to enter into or remain in that market are significantly limited by the contract.

*Collins, supra* at 60,612 (citing *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327–28, 81 S.Ct. 623, 628, 5 L.Ed. 2d 580 (1961). As in *Tampa Electric,* where the Supreme Court focused on whether a coal producer's exclusive contract with an electric utility foreclosed other coal producers from selling their prod-

uct, the appropriate inquiry here is whether competition in the market for the supply of pathology services is substantially impaired by the exclusive contract between a single hospital and a single pathologist or group of pathologists.

> This means that one must view the situation from the point of view of pathologists competing for work, rather than from the point of view of patients in the Hospital and the choices available (or foreclosed) to them when they need pathological services.

*Collins, supra,* at 60,613.[29]

■ The reasons primarily relied upon by the *Collins* court for this conclusion were because the patient generally takes no part in the selection of a particular pathologist and because the hospital has responsibility for assuring the availability of pathology services to its patients. *Id.* Those reasons apply with equal force here. *See, e.g.* Steuer Dep. Tr. at 427, 439, 696; Latham Dep. Tr. at 220–21; Tidikis Dep. Tr. at 56–57, 106.

Morever, as in *Collins,* the plaintiffs here have offered no evidence to support their assertion that CMH constitutes a relevant market for the provision of pathology services apart from their personal preference to offer their services at that hospital. Far more significant is Dr. Steuer's testimony that Dr. Mijanovich's relationship with CMH does not interfere with Dr. Steuer's ability to provide pathology service to or at any hospital other than Cherokee, Steuer Dep. Tr. at 469–70, his testimony that the hospital's contract with Dr. Mijanovich has no impact on the hospital's ability to attract patients, *Id.* at 502–3, and

---

**28.** At oral argument plaintiffs' counsel claimed that they had attacked the Mijanovich Contract only on tying grounds, and insisted they had not claimed that it constituted an impermissible exclusive dealing arrangement. Counsel's suggestion reflects a misreading of Count I of the Complaint and the Amended Complaint, both of which claimed that defendants and unnamed others had combined and conspired "to unreasonably prevent and restrain competition in the furnishing of additional hospital services and professional pathology services to the public and the Plaintiffs will be prevented from practicing their profession and competing in the providing of professional pathology services."

Moreover, in responding to defendants' arguments in their memoranda that the Mijanovich Contract did not constitute an illegal exclusive dealing arrangement, plaintiffs never indicated that defendants had wrongly construed Count I of the Complaint or Amended Complaint.

**29.** This is consistent with *Hyde,* where the Court stated that a rule of reason analysis of an exclusive contract between a hospital and an anesthesiologist "involves an inquiry into the actual effect of the exclusive contract on competition among anesthesiologists." *Hyde, supra,* 466 U.S. at 30, 104 S.Ct. at 1568.

his testimony that pathology services are offered to hospital patients only in conjunction with hospital services. *Id.* at 507. Dr. Steuer's testimony confirms that it is the hospital, rather than the patient, that is the purchaser of pathology services.

It is equally clear that virtually all hospitals arrange for pathology services by contracting with a single pathologist or group of pathologists and that the market in which hospitals seek to contract with pathologists (and pathologists seek to contract with hospitals) is national in scope. Steuer Dep. Tr. at 75, 465–468; Latham Dep. Tr. at 19, 236, Mijanovich Dep. Tr. at 34–37; Harris Affidavit at ¶¶ 34, 41–42. Thus, to paraphrase *Collins*, even though pathologists (such as plaintiffs) who do not have a contract with a hospital may be foreclosed from that hospital, "there still exist many opportunities in hospitals nationwide to pursue a career elsewhere. The real market by which the Court must assess the anticompetitive effect of this exclusive arrangement is the market hospitals look to in hiring pathologists, and [plaintiffs have] failed to show that this market is anything but nationwide." *Collins* at 60,614.

A necessary result from this conclusion regarding the geographic scope of the pathology market is that causing foreclosure of an opportunity at a single hospital cannot constitute a violation of the antitrust laws. Moreover, there is nothing to prevent plaintiffs from bidding for the pathology contract at CMH. The hospital's contract with Dr. Mijanovich is terminable by either party on 90 days notice, which suggests that the hospital can cancel the contract if another pathology provider makes a better bid. *Collins* at 60,614. It is at this level that competition drives the hospital/pathologist relationship.

■ The record evidence is uncontroverted that plaintiffs participated in a competitive bidding process to obtain the exclusive pathology contract at CMH. Unfortunately for them, plaintiffs' bid was approximately twice the amount for which the contract was eventually awarded. The result which obtained is understandably not to the liking of plaintiffs, but it is precisely the result which a competitive bidding process is expected to yield: the contract was awarded to the lowest bidder. The fact that a pathologist is foreclosed from practicing at a single hospital is of no competitive significance because there are many opportunities in hospitals nationwide to pursue a career elsewhere. In sum, "[t]he mere fact that one aspiring competitor has been refused a job does not entitle him to a remedy under the antitrust laws, because the antitrust laws are designed to protect competition, not competitors." *Id.* at 60,-615 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)). Accordingly, the Court finds that, as a matter of law, the Mijanovich Contract is not an impermissible exclusive dealing arrangement.

### 6. *Antitrust Conspiracy*

■ The Fourth Circuit recently addressed the legal standard applicable to plaintiffs' conspiracy allegations:

To survive a motion for summary judgment in an antitrust conspiracy case, a plaintiff must establish that there is a genuine issue of material fact whether defendants entered into an illegal conspiracy that caused the plaintiff to suffer a cognizable injury. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 106 S.Ct. 1348, 1355–56 [89 L.Ed.2d 538] (1986)....

Concerted activity is the essential element of [plaintiff's] claim under Section 1 of the [Sherman] Act. *Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.*, 763 F.2d 604, 610 (4th Cir.1985). But conduct as consistent with permissible competition as with illegal conspiracy does not itself support an inference of antitrust conspiracy. The party opposing summary judgment must present evidence that tends to exclude the possibility that the alleged conspirators acted independently: '[t]hat is, there must be direct or circumstantial evidence that reasonably tends to prove ... a conscious commitment to a common scheme designed to achieve an unlawful objec-

tive.' *See Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 764 [104 S.Ct. 1464, 1471, 79 L.Ed.2d 775] (1984). . . .

*Rockingham, supra*, 820 F.2d at 101 (citations omitted). In enunciating the standards for analyzing summary judgment in the context of antitrust conspiracy cases, the *Rockingham* Court was fully consistent with prior law of this Circuit.[30] As discussed below, plaintiffs failed to "establish that there is a genuine issue of material fact whether defendants entered into an illegal conspiracy, . . ." *Id.*

In Counts I, III and IV of the Amended Complaint, plaintiffs advanced causes of action under Section 1 (conspiracy to restrain trade, boycott) and Section 2 (conspiracy to monopolize) of the Sherman Act which require a showing that defendants were engaged in a conspiracy with others. The record, however, unequivocally supports defendants' claim that they acted unilaterally[31] in deciding not to renew the Steuer/Latham Agreement, and in deciding to enter into the Mijanovich Contract. There is no evidence which even tends to indicate that either of those decisions was made jointly by defendants with any other person or entity. Messrs. Tidikis and Moran, both of whom are employees of defendants, testified that defendants unilaterally determined that it was in defendants' best interest not to renew the plaintiffs' contract. Each of them cited numerous legitimate business reasons in support of defendants' decision;[32] none of the reasons cited by Messrs. Tidikis or Moran included a desire by defendants to secure a competitive advantage over or to inflict competitive injury upon plaintiffs. Likewise, plaintiffs do not contend that defendants were motivated by an anticompetitive animus in deciding not to renew the Steuer/Latham Agreement, nor do plaintiffs claim that the goals underlying defendants' decision not to renew the Steuer/Latham Agreement were otherwise impermissible (except insofar as the decision had the effect of excluding plaintiffs from practicing pathology at CMH).

The only evidence suggesting concerted action by defendants is plaintiffs' testimony that members of the medical staff, members of CMH's board of directors, and Dr. Mijanovich assisted defendants both in implementing their decision not to renew the plaintiffs' contract, and in entering into

---

**30.** In *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir.1985), the Fourth Circuit emphasized that unsupported allegations and conclusions "do not confer talismanic immunity from Rule 56." Conclusory assertions of conspiratorial conduct simply are not sufficient to avoid summary judgment. *Ottensmeyer v. Chesapeake & Potomac Telephone Co.*, 756 F.2d 986, 992 (4th Cir.1985). Likewise, a conspiracy cannot be inferred from conduct that is as consistent with independent action as with a conspiracy. *See The Garment District, Inc. v. Belk Stores Services, Inc.*, 799 F.2d 905, 911 (4th Cir.1986). Finally, the Fourth Circuit had always recognized that "[t]he non-moving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985).

**31.** Since defendants are under common ownership they must be treated as a single entity for antitrust purposes. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984).

**32.** Mr. Tidikis, defendants' Regional Vice President, testified that based on various existing deficiencies, licensure and inspection problems and continuing "service level problems," it was his perception that a great deal of improvement was necessary in the CMH Pathology Department. Tidikis Dep. Tr. at 23, 109. Among these problems were deficiencies in the laboratory, *id.* at 23, turn-around time and reliability of results, *id.* at 26, and problems with supervision of the laboratory by the pathologist, *id.* at 27. Mr. Tidikis also testified as to the advantages of exclusivity from the perspective of hospital administration: *e.g.*, it establishes one point of contact with responsibility for the medical direction of a department affixed with one individual or group, and also facilitates risk management. *Id.* at 56–57. Defendants offered plaintiffs a contract which, if accepted by plaintiffs, would have facilitated the correction of the problems in the Pathology Department, particularly in relation to "the defining of responsibilities of and supervision and who was going to do what in the laboratory." *Id.* at 109. Plaintiffs rejected that contract and defendants entered into a contract with Dr. Mijanovich, who was willing to provide the pathology services required by CMH at a cost to the hospital substantially below both the amount previously paid to plaintiffs and the figure proposed by plaintiffs during the negotiations which preceded their non-renewal.

a contract with Dr. Mijanovich. Steuer Dep. Tr. at 316–321. The sum and substance of plaintiffs' claim against certain members of the medical staff and the board of directors is that they shared defendants' view that it was in the hospital's best interest to replace plaintiffs, and that these members assisted defendants in their effort to recruit Dr. Mijanovich. Steuer Dep. Tr. at 316–321. Plaintiffs concede, however, that none of the members of the medical staff or the board of directors was a competitor of plaintiffs, or that any such person was motivated by a desire to secure a competitive advantage over or to inflict competitive injury upon plaintiffs. Likewise, plaintiffs do not contend that defendants exerted any pressure of any kind whatsoever on any of the medical staff or the board of directors.

With respect to Dr. Mijanovich, plaintiffs' only complaint is that he eventually signed the contract which had the effect of displacing plaintiffs as the sole pathology providers at Cherokee Memorial. Plaintiffs do not contend that defendants exerted pressure on Dr. Mijanovich or that Dr. Mijanovich exerted pressure on defendants.

In these circumstances there is simply no evidentiary support for plaintiffs' claims that defendants combined and conspired with others in deciding to enter into a contract with Dr. Mijanovich in lieu of plaintiffs. The record is devoid of any evidence that defendants and others " 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.' " *Monsanto, supra,* 465 U.S. at 764, 104 S.Ct. at 1471 (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 111 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)). Instead, as in *Rockingham, supra,* 820 F.2d at 103, "[t]he evidence conclusively establishes that [defendants] acted unilaterally. [Defendants] decided that assigning full responsibility for [pathology services] to [Dr. Mijanovich], rather than fragmenting accountability, would best serve the interests of patients and promote

efficient use of the [pathology department]." Likewise, plaintiffs have failed to develop "evidence that tends to exclude the possibility" of independent action. *Monsanto, supra,* 465 U.S. at 764, 104 S.Ct. at 1471. As in *Collins, supra,* at 60,617:

> [The] Hospital had the right to hire or not hire Dr. Collins as an independent pathologist, based upon its perceived need for pathologists in addition to those working for APL. To suggest that APL used its influence to cause St. John's Hospital to reach this decision is merely to suggest that APL wanted St. John's to abide by the terms of its contract with APL, in which the Hospital agreed that APL would provide complete and adequate professional pathology services.

■■■■ In short, plaintiffs' conspiracy arguments ultimately reduce themselves to an assertion that defendants negotiated secretly with Dr. Mijanovich, and that defendants eventually entered into a contract with Dr. Mijanovich. These factual allegations do not, as a matter of law, permit an inference of antitrust conspiracy. Plaintiffs' conspiracy claims are likewise suitable for summary disposition due to plaintiffs' failure to controvert defendants' factual assertion that their decision to contract exclusively with Dr. Mijanovich hinged on quality of service and other legitimate business reasons.[33] In the absence of explicit, direct evidence of an anticompetitive conspiracy, plaintiffs' conspiracy allegations must be rejected where the defendants demonstrate legitimate business reasons for their action. "That the challenged conduct of appellants is consistent with legitimate activity ... weighs against inferring a conspiracy." *Cooper v. Forsyth County Hospital Authority, Inc.,* 789 F.2d 278, 282 n. 14 (4th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 474, 93 L.Ed.2d 418 (1986) (citations omitted).

In sum, there is a total lack of evidence of the relevant conspiracy. "The absence of proof of a conspiracy also supports ... entry of summary judgment against [plaintiffs] on his claims of a group boycott,

---

**33.** *Cf. Cooper v. Forsyth County Hospital Authority, Inc.,* 789 F.2d 278, 282 (4th Cir.) *cert. denied,* —— U.S. ——, 107 S.Ct. 474, 93 L.Ed.2d 418 (1986).

which requires an agreement among competitors...." *Rockingham, supra* at 820 F.2d at 103, citing *Fashion Originators' Guild v. Federal Trade Commission,* 312 U.S. 457, 312 U.S. 668, 61 S.Ct. 703, 85 L.Ed. 949 (1941). *See also Fine v. Barry & Enright Productions,* 731 F.2d 1394, 1398 (9th Cir.), *cert. denied,* 469 U.S. 881, 105 S.Ct. 248, 83 L.Ed.2d 186 (1984) ("some concerted effort at a single market level—a horizontal combination or agreement—is requisite before the type of *per se* violation commonly termed a 'group boycott' can be found to exist"). The Fourth Circuit has suggested—if not held—the same, *see Terry's Floor Fashions v. Burlington Industries, Inc.,* 763 F.2d 604, 610 n. 10 (4th Cir.1985), as has almost every other circuit. *See generally,* American Bar Association Section of Antitrust Law, *Antitrust Law Developments* 44 & n. 307 (3d ed. 1984), & *id. First Supplement 1983–1986* at 27 (1986).

Since plaintiffs have failed to adduce record evidence that would support a finding of joint collective action, summary judgment is warranted as to Counts I and III and the conspiracy to monopolize portion of Count IV.

### 7. *The Section Two Claims*

In Count IV of the Amended Complaint, plaintiffs allege monopolization, attempted monopolization and conspiracy to monopolize claims under Section Two of the Sherman Act. The markets allegedly victimized under these claims are medical/surgical services and professional pathology services in Cherokee County. As the foregoing discussion suggests, however, plaintiffs' failure to substantiate their allegations regarding the product and geographic markets relevant to this case mandates summary judgment for the defendants on these claims as well.

### (i) *Monopolization*

Monopoly power is "the power to control market prices or exclude competition." *United States v. E.I. DuPont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). To determine the existence of monopoly power, it is, of course, necessary to define the relevant market in which the ability to raise price or exclude proper competitors is to be tested. In the absence of properly defined markets, "there is no way to measure [a defendants'] ability to lessen or destroy competition." *Walker Process Equipment, Inc. v. Food Machines & Chemical Corp.,* 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965). The object of market definition, in short, is to determine who is competing against whom, for what, and where. The burden of proving the relevant market rests with the plaintiff. *White & White, Inc. v. American Hospital Supply Corp.,* 540 F.Supp. 951, 980 (W.D.Mich.1982), *rev'd on other grounds,* 723 F.2d 495 (6th Cir.1983); *United States v. Chas. Pfizer & Co.,* 246 F.Supp. 464 (E.D.N.Y.1965). After the relevant antitrust market has been identified, the plaintiff must establish (1) the possession of monopoly power in that market, (2) the unlawful acquisition or maintenance of that power and (3) causal antitrust injury. *Rockingham, supra,* 820 F.2d at 104; *United States v. Grinnell Corp.,* 384 U.S. 563, 570–571, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966).

From this Court's previous discussion regarding the product market relevant to this case, it follows that plaintiffs' monopolization claims must fail. In light of the Court's conclusion, in the context of plaintiffs' tying claims, that the provision of pathology services is not a separate product or service from the package of services offered by a hospital, it would be anamolous to find that pathology services do constitute a separate product market for purposes of monopolization analysis. "Because the Court finds as a matter of law that there is no relevant product market consisting of providing pathological services to individual patients, the [p]laintiff[s] must necessarily fail in [their] attempts to allege monopolization with regard to this product market." *Collins, supra,* at 60,-620.

Moreover, as a matter of law plaintiffs cannot prevail on their allegation of monopolization in the product market of

medical/surgical services because they are neither providers nor consumers of these services. *See Rockingham,* 820 F.2d at 104 (citing *Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519, 539, 103 S.Ct. 897, 909, 74 L.Ed.2d 723 (1983)). In addition, there is nothing in the record to establish that CMH competes in the market for professional pathology services—a market which, by its very description, consists of the professional services of pathologists. As discussed above, and in *Collins,* the hospital's relationship with the market for professional pathology services is fundamentally that of a consumer which shop for pathologists who compete in a national market for contracts with hospitals. Equally clear, as discussed above, is that the hospital has not entered into any antitrust conspiracy. "One who does not compete in a product market or conspire with a competitor cannot be held liable as a monopolist in that market." *Rockingham,* 820 F.2d at 104–105 (citing *Ball Memorial Hospital v. Mutual Hospital Insurance, Inc.,* 603 F.Supp. 1077 (S.D.Ind.1985), *aff'd,* 784 F.2d 1325 (7th Cir.), *reh'g denied,* 788 F.2d 1223 (7th Cir.1986)).[34]

#### (ii) *Attempted Monopolization*

■ In order to prove attempted monopolization the plaintiff must demonstrate that the defendants had a specific intent to monopolize and that there was a dangerous probability that the attempt would be successful in achieving a monopoly in the relevant market. *Swift & Co. v. United States,* 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905); *White Bag Co. v. International Paper, Co.,* 579 F.2d 1384 (4th Cir.1974). A showing of the specific intent required for attempted monopolization requires more than the mere intent to do the complained of act. Rather, the plaintiff must prove that the defendant had a specific intent to control price or destroy competition. *See, e.g., Times–Picayune Publishing Co. v. United States,* 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953).

■ Here, the record demonstrates unequivocally that defendants had neither the incentive nor the ability to injure competition in any relevant market. To the contrary, because of the structure of the market in which CMH competes, a decline in the quality or an increase to supra-competitive levels in the price of services provided at the Hospital would injure, not benefit the Hospital. Not surprisingly, therefore, plaintiffs can point to no evidence that the defendants had a specific intent to monopolize. In addition, there is no evidence to suggest that the conduct of CMH—which was not engaged in competition with the plaintiffs—was in any sense predatory.

#### (iii) *Conspiracy to Monopolize*

■ The elements of the offense of conspiracy to monopolize are (1) the existence of a combination or conspiracy; (2) an overt act in furtherance of the conspiracy; (3) a substantial amount of commerce affected; and (4) specific intent to monopolize. *United States v. Yellow Cab Co.,* 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). *See also, Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 709–10, 82 S.Ct. 1404, 1416, 8 L.Ed.2d 777 (1962). The gravamen of a conspiracy to monopolize is the agreement to commit an illegal act. *United States v. Chas. Pfizer & Co.,* 246 F.Supp. 464 (E.D.N.Y.1965); *see also, Cullum Electric & Mechanical, Inc. v. Mechanical Contractors Assn.,* 436 F.Supp. 418, 425 (D.S.C.1976), *aff'd,* 569 F.2d 821 (4th Cir.), *cert. denied,* 439 U.S. 910, 99 S.Ct. 277, 58 L.Ed.2d 255 (1978).

---

**34.** Plaintiffs belatedly attempted to avoid this conclusion by suggesting for the first time in their Opposition to Defendants' Motion for Summary Judgment that they do compete with the hospital for the provision of the technical component of anatomical surgical consults. To the extent that this claim has any validity, it can relate only to competition for providing the technical component of anatomical surgical consults for pathology specimens generated from locations other than CMH. Such competition occurs in the market in which the CMH pathology laboratory competes primarily with reference labs located throughout the southeast. The only evidence in the record regarding this reference lab market confirms that it is characterized by vigorous competition and is not susceptible to monopolization by CMH.

As discussed above, defendants' decision not to renew the plaintiffs' contract to provide pathology services at the hospital can in no sense be construed as the product of an antitrust conspiracy, and the absence of market power belies any inference of specific intent to monopolize.

Finally, two other conclusions of the Fourth Circuit in the *Rockingham* case are useful in placing the Section 2 claims here in proper perspective. First, the Court specifically rejected the plaintiff's claim that his radiologist competitors, who were the only official interpreters of CT scans in the county, had monopoly power because "the hospital's board, which unilaterally designated them, can relieve them of their position at any time." *Rockingham*, 820 F.2d at 105. CMH has virtually the same ability to replace its contract pathologist. Second, in order to satisfy the second element of monopolization, the willful acquisition or maintenance of monopoly power, "[the plaintiff] must show that a jury could find no valid business reason or concern for efficiency in the hospital's choice of the radiologists." *Id.* at 105, (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 2856–62, 86 L.Ed.2d 467 (1985)). No such showing has been made by the plaintiffs herein.

## B. *The State Antitrust Claims*

In Count VII of their Amended Complaint plaintiffs claim, on the basis of the same allegations purportedly giving rise to federal antitrust liability, that the defendants have "committed unlawful acts which adversely affect competition in violation of S.C.Code Ann. § 39–3–10 and have entered into agreements or relationships which give rise to monopolies and agreements in restraint of trade in violation of S.C.Code Ann. §§ 39–3–130 and 39–3–149." Amended Complaint at ¶ 60. Because "South Carolina has long adhered to a policy of following federal precedents in matters relating to state trade regulation enforcement," *In re Wiring Device Antitrust Litigation*, 498 F.Supp. 79 (E.D.N.Y.1980), defendants contend that the foregoing analysis of plaintiffs' claims under federal antitrust law is equally dispositive of plaintiffs' Count VII. Accordingly, summary judgment is granted to defendants on Count VII.

## C. *The State and Federal Unfair Trade Claims*

In Count VIII of their Amended Complaint plaintiffs allege that defendants' conduct violates S.C.Code Ann. § 39–5–20, which prohibits unfair methods of competition and unfair or deceptive practices, as well as the federal Unfair Trade Practice Act, 15 U.S.C. § 45.[35] With respect to the unfair trade claim under state law, S.C. Code Ann. § 39–5–140(a) creates a private right of action for persons damaged by acts or practices declared unlawful by § 39–5–20. This cause of action is limited, however, "to only those unfair or deceptive acts or practices ... that affect the public interest." *Noack Enterprises Inc. v. Country Corner Interiors Inc.*, 290 S.C. 475, 351 S.E.2d 347, 349 (S.C.App.1986). Thus, "an unfair or deceptive act or practice that affects only the parties to a trade or a commercial transaction is beyond the act's embrace.... The act is not available to redress a private wrong when the public interest is unaffected." *Id.* at 350. As the foregoing discussion of plaintiffs' antitrust claims makes clear, the record in this case does not substantiate any injury to competition. At most, plaintiffs are disappointed

**35.** It is well established that there is no private right of action under the Federal Trade Commission Act. *Holloway v. Bristol–Myers*, 485 F.2d 986 (D.C.Cir.1973); *see also, Carlson v. Coca Cola Co.*, 483 F.2d 279, 280 (9th Cir.1973). In addition, District Courts in the Fourth Circuit have adopted this view. *See Summey v. Ford Motor Credit Co.*, 449 F.Supp. 132 (D.S.C.1976), *aff'd mem*, 573 F.2d 1306 (4th Cir.1978) ("it is well settled that there is no private, federal claim for which this court can grant relief for violations of the Federal Trade Commission Act." *Id.* at 135); *L & H Investment, Ltd. v. Belvey Corp.*, 444 F.Supp. 1321 (W.D.N.C.1978); *United Roasters, Inc. v. Colgate–Palmolive Co.*, 485 F.Supp. 1049 (E.D.N.C.1980) ("there is no private right of action under the Federal Trade Commission Act," *Id.* at 1059 n. 7). Accordingly, defendants are plainly entitled to judgment as a matter of law on plaintiffs' unfounded claim under 15 U.S.C. § 45.

competitors who may now find it necessary to practice elsewhere, rather than at Cherokee Memorial Hospital, "but there has been no showing that the market as a whole has been affected by the contract." *Jefferson Parish v. Hyde, supra,* at 466 U.S. 31, 104 S.Ct. at 1568. Accordingly, absent a showing of harm to the public interest, defendants are entitled to summary judgment on Count VIII as well.

### D. *The Federal Civil Rights Claim*

In Count V of their Amended Complaint, plaintiffs have alleged a violation of 42 U.S.C. § 1983. Section 1983 provides:

> Every person who, under color of any [law] ... of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution ... shall be liable to the party injured in an action at law....

42 U.S.C. § 1983. In order to prevail on this claim, plaintiffs must show that defendants were acting under color of state law and that defendants' conduct deprived plaintiffs of rights, privileges or immunities that are protected by the United States Constitution. *See Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed. 2d 572 (1980); *Hatteras v. Southwestern Bell Telephone Co.,* 774 F.2d 1341 (5th Cir.1985). Plaintiffs contend that defendants were acting under color of state law and that defendants' conduct deprived them of their right to practice pathology in Cherokee County and suspended their

medical staff privileges at CMH without due process in violation of the United States Constitution. It is clear from the record that plaintiffs failed to adduce evidence to satisfy either of these essential requirements.

### 1. *Action Under Color of State Law*

Plaintiffs have argued that defendants' actions were taken under color of state law because (i) CMH was never officially dissolved as a special purpose district and (ii) defendants' conduct constituted state action under the standards set forth in *Modaber.* Although there is no blanket rule which can be applied to every type of action brought under 42 U.S.C. § 1983, *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 725–26, 81 S.Ct. 856, 861–62, 6 L.Ed.2d 45 (1961), the Supreme Court has considered whether action taken under color of state law, or state action,[36] is present in several different factual settings.[37] On the basis of these decisions, lower courts, including the Fourth Circuit, have developed standards which clearly demonstrate the absence of "state action" in this case.

In *Modaber v. Culpeper Memorial Hospital, Inc.,* 674 F.2d 1023 (4th Cir.1982), the Fourth Circuit applied the Supreme Court's tests in determining that no state action was present when a hospital revoked staff privileges for a physician. In *Modaber,* a physician charged that revocation of staff privileges by a private, non-profit hospital deprived him of a valuable property right without due process. *Id.* at 1024. The physician contended that the revocation of

**36.** Action under color of state law is analyzed under the same standards required to demonstrate state action under the Fourteenth Amendment. *United States v. Price,* 383 U.S. 787, 794, n. 7, 86 S.Ct. 1152, 1157, n. 7, 16 L.Ed.2d 267 (1966); *see also Rendell–Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 2769, 73 L.Ed.2d 418 (1982).

**37.** *See Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (no state action where private school supported by public funding discharges teachers); *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (no state action by nursing home operators who decide whether Medicaid patients should be transferred or discharged); *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744,

73 L.Ed.2d 482 (1982) (state action present where sheriff executes writ of attachment at behest of private party and in accordance with statute); *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) (no state action where monopoly utility, heavily regulated by state, terminates service); *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972) (no state action in private party's racial discrimination by virtue of state regulation of liquor licenses); *Burton,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (state action present where state leases space in parking structure to restaurant which practices racial discrimination, and state profits from arrangement).

privileges was attributable to the state because the hospital received a federal Hill–Burton Act grant for hospital construction, accepted Medicare and Medicaid patients, and was required by statute to report the withdrawal of privileges to state medical licensing authorities. *Id.* In analyzing whether state action was present the Fourth Circuit applied a three part test. A state becomes responsible for a private party if the private party acts:

(1) in an exclusively state capacity,

(2) for the state's direct benefit, or

(3) at the state's specific behest.

*Id.* at 1025.[38] Each of these concepts is discussed in detail below.

■ The General Agreement and the Lease Agreement make it abundantly clear that the defendants and Cherokee County intended that defendants would:

construct and operate ... an entirely new hospital (the "New Hospital") in substitution for and replacement of [CCMH] ..., and to operate under [their] own auspices a hospital (the "Interim Hospital") in the place and stead ... and at the site of [CCMH], until such time as the New Hospital shall commence operations."

General Agreement at p. 1; Lease Agreement at p. 1. In addition, the General Agreement states that the defendants will operate the Interim Hospital "for [their] own account," General Agreement § 3, and that Cherokee County "shall cease to operate [CCMH]" on the date when the Interim Hospital commences operations, General Agreement § 3.04. And, perhaps most importantly, the General Agreement also pro-vides that the defendants "will have final authority and responsibility for all decisions relating to the management and operation of the Interim Hospital and the New Hospital." General Agreement § 7. These provisions establish that Cherokee County intended to abandon in its entirety its responsibility for and interest in the operation of CCMH as a special purpose district. In light of this compelling evidence, it is clear that defendants' conduct did not constitute state action. To hold otherwise merely because the formal procedures required to dissolve a special purpose district may not have been followed would exalt form over substance. It is equally clear, for the reasons discussed below, that plaintiffs cannot establish state action under any of the standards discussed by the Fourth Circuit in *Modaber*. This is especially true where, as here, the state has expressed an intention not to be involved with the very activity alleged to constitute state action.

First, the *Modaber* court explained that a private party acts in an exclusively state capacity when it exercises powers traditionally exclusively reserved to the state, *id.*, citing *Jackson*, 419 U.S. 345, 352, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974), as in cases involving political party control of elements of the electoral process or company town cases. *Modaber*, 674 F.2d at 1025, n. 6; *see Thompson v. Charleston Area Medical Center, Inc.*, 539 F.Supp. 671, 676 (S.D.W. Va.1982). Although health care is an essential service, the court held that it does not involve the exercise of powers traditionally reserved exclusively to the State. *Modaber*, 674 F.2d at 1026. Moreover, de-

---

**38.** Two later Court cases reach conclusions consistent with *Modaber*. In *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), the Court considered to what extent state officials, as defendants, could be held responsible for acts of private individuals who decided to transfer or discharge Medicaid patients. While recognizing this case is "obviously different from those cases in which the defendant is a private party and the question is whether his conduct has sufficiently received the imprimatur of the state so as to make it 'state action,' " *id.* at 1003, 102 S.Ct. at 2785, the Court adopted tests from its earlier cases in deciding no state action was present. *Id.* at 1004–12, 102 S.Ct. at

2785–89. In *Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), the Court applied the rationale developed in *Blum* and its earlier decisions to find no state action in the discharge of teachers from a private school which received substantial public funding.

In *Carter v. Norfolk Community Hospital Association,* 761 F.2d 970 (4th Cir.1985), the Fourth Circuit, citing its earlier decision in *Modaber* and the Supreme Court's *Blum* decision, held there was no state action in the revocation of a doctor's hospital privileges by the hospital, allegedly at the behest of a private organization which reviewed Medicare and Medicaid abuse.

fendants do not have any agreement with Cherokee County by which defendants are authorized to, or do in fact, exercise powers exclusively reserved to the State, nor have plaintiffs alleged such a relationship. Accordingly, defendants have not acted under color of state law under this part of the *Modaber* test.

Second, *Modaber* teaches that a private party acts for the state's direct benefit when it shares the rewards and responsibilities of a private venture with the state. *Id.* The *Modaber* court specifically rejected contentions that acceptance of Hill–Burton Act grants and Medicare and Medicaid benefits and the extensive federal and state regulation of hospitals transformed a private hospital's conduct into state action. *Id.* at 1026–27. Nor does an agreement to accept indigent patients constitute state action. *Greco v. Orange Memorial Hospital Corp.*, 513 F.2d 873 (5th Cir.1975), *cert. denied*, 423 U.S. 1000, 96 S.Ct. 433, 46 L.Ed.2d 376 (1975). Under *Modaber*, even though a private hospital may be within a legislative design to provide better health care to the public and may be subject to extensive regulation, if a private entity remains solely responsible for providing the health care service and is solely entitled to the profits therefrom, the hospital does not act for the state's direct benefit. *Modaber*, 674 F.2d at 1026. *Id.*

This is consistent with *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), where the court held there was no "state action" where a state regulated monopoly utility terminated electrical service. The upshot of *Jackson* is that state involvement without state responsibility is insufficient to establish state action.[39] It is thus clear from *Modaber* that plaintiffs' contentions that CMH was originally built with federal and County funds and that NME agreed to accept indigent patients are insufficient to establish "state action."

Plaintiffs also contend that the lease of the hospital building and grounds by defendants from Cherokee County suggest state action. The Fifth Circuit has considered this situation in *Greco*, 513 F.2d 873 (5th Cir.1975), where a physician challenged a hospital medical policy. *Id.* at 874–75. In *Greco*, the hospital premises were leased from the county in which the hospital was located. *Id.* at 876. The hospital was tax-exempt, paid only $1 per year for the lease, and was required to report annually to the county. *Id.* The Fifth Circuit held there was no "state action" by the hospital since the hospital retained control of and responsibility for the establishment and administration of the medical policy of which the doctor complained. *Id.* at 882. There is no indication in the record that defendants' transaction with Cherokee County was anything other than at arms-length. Defendants, who operate on a for-profit basis, retained all responsibilities for awarding and administering contract services and for personnel policy at CMH. Thus, there is even less connection between NME and the county than was present in *Greco*, where the existence of a one year lease between the private party and the county did not establish state action.

■ Finally, plaintiffs contend that contracts between defendants and the County required retention of medical staff, including plaintiffs, and included ongoing obligations of defendants to Cherokee County, and that by virtue of the contract Cherokee County retains control over the operations and policies of Cherokee. The Supreme Court recognized in *Rendell–Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), that governments enter into agreements with private entities for a wide variety of services without the acts of the private entities thereby (or thereafter) becoming acts of the government. *Id.* at 840–41, 102 S.Ct. at 2770–71. The provisions for staff retention and the ongoing obligations of defendants to Cherokee County are normal incidents to a contract

---

**39.** The Fourth Circuit had held in a line of cases that acceptance of Hill–Burton Act grant funds was sufficient to establish state action on the part of recipient hospitals. *Modaber*, 674 F.2d

at 1025. *Modaber*, however, specifically overruled the earlier cases, *id.* at 1026, in light of *Jackson*.

transferring the operation of a hospital from a government to a private entity, and are not undertaken to provide a direct benefit to the County. A finding of direct benefit to the state in this context must be supported by the existence of an economic interdependence that involves a sharing of profits and responsibility. *Thompson*, 539 F.Supp. at 678; *see Modaber*, 674 F.2d at 1025, n. 7. Defendants and Cherokee County share no profits, losses, or revenues from CMH, and defendants gained, and have maintained, complete control of the operations of CMH. Accordingly, none of plaintiffs' assertions establish that defendants have acted for the state's direct benefit so as to constitute "state action."

Third, *Modaber* explained that a private party acts at the state's specific behest when it does a particular act which the state has directed or encouraged. *Modaber*, 674 F.2d at 1025. A causal relationship between the complained of act and the state must be established to satisfy this test. *Thompson*, 539 F.Supp. at 677. Plaintiffs have not alleged, nor does the record show, any connection between defendants' non-renewal decision and any specific act, policy, or practice of Cherokee County. Moreover, employees of defendants and representatives of the County testified that the County had no role in defendants' decision not to renew the Steuer/Latham Agreement. (Medley Dep. Tr. at 37, 53; Moran Dep. Tr. at 56–57.)

In sum, plaintiffs have failed to demonstrate that the relationship between defendants and Cherokee County was such that defendants acted "under color of state law" within the meaning of 42 U.S.C. § 1983. Although the absence of state action is alone sufficient to defeat plaintiffs' claim under 42 U.S.C. § 1983, it is also clear that plaintiffs have not established that they have been deprived of any constitutionally protected right.

### 2. Deprivation of a Protected Right

In order to establish the existence of a valuable liberty or property interest that is entitled to due process protection, plaintiffs must demonstrate that they have "more than an abstract need or desire for it … [or] a unilateral expectation of it. [They] must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). As discussed below, the record reveals, contrary to plaintiffs' contentions, that plaintiffs have retained their status as members of CMH's medical staff and that defendants have not restricted plaintiffs' medical staff privileges in any way. Thus, without ever considering whether plaintiffs' medical staff privileges would constitute a protected right, it is clear that plaintiffs cannot prevail because they still enjoy the very rights on which the Section 1983 claim is based.

First, the record shows that plaintiffs' pathology contract provided that either party may terminate the agreement upon 60 days written notice. August 1, 1984 Addendum to Steuer/Latham Agreement. In fact, Dr. Steuer has admitted that defendants had every right not to renew plaintiffs' pathology contract with CMH and to enter into a new pathology contract with another pathologist. Steuer Dep. Tr. at 159. Second, Dr. Steuer has admitted that his medical staff privileges in pathology (as distinguished from his rights under the Steuer/Latham Agreement) have not been changed in any way since CMH was acquired by the defendants. Steuer Dep. Tr. at 215. Third, plaintiffs have admitted that they currently maintain a private laboratory with the capacity to perform anatomical and surgical pathology and that their ability to perform anatomical and surgical pathology does not depend on access to the clinical laboratory facilities at CMH. Steuer Dep. Tr. at 131. Fourth, Dr. Steuer has admitted that plaintiffs have the ability to earn income from sources other than CMH. Steuer Dep. Tr. at 617. These facts lead inexorably to the conclusion that defendants' conduct has not in any way affected plaintiffs' ability to practice pathology in Cherokee County or plaintiffs' staff privileges at CMH.

In *Engelstad v. Virginia Municipal Hospital*, 718 F.2d 262 (8th Cir.1983), a pathologist who was terminated as the di-

rector of a hospital pathology department brought claims under 42 U.S.C. § 1983 and the hospital bylaws that are identical to the claims in the case at bar. The Court held that because the physicians' position as director "was terminable at will ... he had no protected property interest in that position sufficient to trigger a due process hearing." *Id.* at 266. (citations omitted). Because plaintiffs' pathology contract with defendants was likewise terminable at will, plaintiffs' pathology contract does not constitute a property interest worthy of due process protection in the present case. More importantly, however, the *Engelstad* Court held that, "[b]ecause [the physicians'] staff privileges remained intact after his director's position was terminated, he was not entitled to the procedures set forth in the bylaws. [citations omitted]." *Id.* at 268. In discussing the impact on the physician's staff privileges at the hospital (and in rejecting arguments identical to the arguments advanced by plaintiffs here), the Court distinguished between rights that derive from a physician's status as a member of the medical staff and rights that derive from a physician's status as contract physician:

> Staff privileges do not establish an employment contract with the hospital. Nor do they guarantee a doctor that his authorized practice in the hospital will have a particular economic value. Rather, the use a doctor makes of his staff privileges depends upon some independent source ... In the case of a pathologist that source may be some independent contractual arrangement with the hospital to provide pathology services to the hospital.

> \*　\*　\*　\*　\*　\*

With this background, we can now address [the physician's] claim that the termination of his directorship effectively reduced or terminated his staff privileges. Whatever expectation [the physician] had of earning a particular level of income from his pathology practice was predicated upon his contract to serve as

director of pathology, not his staff privileges. Indeed, it was his contract with the hospital that gave economic meaning to the exercise of his staff privileges.

\*　\*　\*　\*　\*　\*

The bylaws' procedural requirements were intended only to cover cases where a doctor's privileges have been reduced or terminated, which is typically the result of complaints regarding the doctor's professional competence or ethical behavior. Those procedures were not intended to cover cases, like the present one, where the use a doctor can make of his staff privileges has been incidentally affected by the hospital's administrative decision to terminate a personal service contract with the hospital. [The physician's] staff privileges guaranteed him only the authority, not the wherewithal, to practice his profession. His authority to practice his profession at the hospital has not been reduced or terminated, but remains intact.

*Id.* at 267–68. *Engelstad* thus provides conclusive support for this Court's conclusion that plaintiffs have not been deprived of any liberty or property right at all because they still retain their medical staff privileges at CMH.[40]

In sum, then, it is clear from the record that plaintiffs have failed to present any evidence that defendants' conduct constituted state action or that defendants' conduct deprived plaintiffs of any constitutionally protected rights. Under such circumstances, this Court has no choice but to grant defendants' motion for summary judgment regarding plaintiffs' claims under 42 U.S.C. § 1983.

### E.　*The State Common Law Causes of Action*

In Count VI of their Amended Complaint (¶ 56–58), plaintiffs allege that defendants tortiously interfered "with Plaintiffs' rights and negotiations to contract with physicians and patients in Cherokee County." *Id.* at ¶ 57. This claim is based on the "request for plaintiffs' professional pathol-

---

**40.** *Collins* also contains language indicating that a physician's rights as a contract physician have

nothing to do with his rights as a member of the medical staff. *See* discussion at n. 43 herein.

ogy services made by physicians after July 14, 1985...." *Id.* Although the language of the Amended Complaint is not entirely clear, the only meaningful interpretation of Count VI is that plaintiffs have alleged that defendants have committed the separate torts of tortious interference with contractual relations and tortious interference with prospective economic advantage. The record reveals that each of these claims is totally without merit.

In order to prevail on the claim for tortious interference with contractual relations, plaintiffs must first establish the existence of a valid contract, *Parker v. Brown*, 195 S.C. 35, 10 S.E.2d 625, 631 (1940), cited in *Keels v. Powell*, 207 S.C. 97, 34 S.E.2d 482, 484 (1945). The essential elements of a contract are an offer, acceptance and valid consideration. *Pierce v. Northwestern Mutual Life Insurance Co.*, 444 F.Supp. 1098 (D.S.C.1978). The South Carolina Supreme Court has restated these elements as contractual intent, followed by an actual meeting of the minds accompanied by a valid consideration. *Caulder v. Knox*, 251 S.C. 337, 162 S.E.2d 262, 266 (S.C.1968). None of these elements are present in the case at bar.

Plaintiffs have alleged only that defendants have diverted the staff physicians' *requests* to perform pathology services. They have not alleged, nor have they adduced any evidence, that the elements necessary to establish a valid contract are present in this case. Such requests, if they carry any contractual significance at all, can only be viewed as offers. A "mere declaration of intent will not give rise to a contract." *Caulder*, 162 S.E.2d at 266. Without an actual agreement between the parties as to all essential terms, there is no contract. *Stanley Smith & Sons v. Limestone College*, 283 S.C. 430, 322 S.E.2d 474, 477 (1984). The record does not contain any evidence that the physicians' offers had been accepted by plaintiffs or that the parties had exchanged valuable consideration. In fact, the only action taken by defendants was to direct the requests to Dr. Mijanovich, as required by the contract defendants had entered into with Dr. Mijanovich, at a time when the requests had not yet been accepted and transformed into binding contracts. Under these circumstances, there were no contractual relations yet in existence with which plaintiffs could possibly have interfered.[41]

Even if plaintiffs somehow managed to establish that the "requests" forming the basis for Count VI constituted enforceable contracts, however, they must also prove that the claimed interference was without justification. *Keels v. Powell*, 34 S.E.2d at 484; *Todd v. South Carolina Farm Bureau*, 283 S.C. 155, 321 S.E.2d 602 (1984). Here, plaintiffs do not dispute that CMH had the right not to renew its contract with plaintiffs and to enter into a contract with Dr. Mijanovich. CMH, of course, elected to contract with Dr. Mijanovich and to do so in a manner which required that all requests for primary clinical and anatomical pathology consultants for patients at the hospital be handled by Dr. Mijanovich. In directing such requests to Dr. Mijanovich after July 14, 1985, the defendants were merely complying with their obligations under their contract with Dr.

---

**41.** The action for tortious interference with contractual relations has never been expanded by the South Carolina courts to encompass prospective contractual relations. *Smith v. Holt, Rinehart & Winston, Inc.*, 270 S.C. 446, 242 S.E.2d 548 (1978); *Columbia Management Corp. v. Resort Properties*, 279 S.C. 370, 307 S.E.2d 228 (1983); *Todd v. South Carolina Farm Bureau Mutual Insurance Company*, 283 S.C. 155, 321 S.E.2d 602 (1984), *reversed on other grounds*, 287 S.C. 190, 336 S.E.2d 472 (1985). In fact, South Carolina has explicitly rejected the invitation to recognize such a cause of action:

We think that the limitation on a cause of action for intentional interference to instances where there is a valid contract in existence is justified by the fact that the parties have a property right in an existing contract ... [but] the law affords no protection to rights which are not yet in existence.

*Smith, supra*, 242 S.E.2d at 549. The same court also expressed its view that if an action for tortious interference with prospective contractual relations was to become the law in South Carolina, it should be by legislative enactment. *Id.* Accordingly, plaintiffs' claim of tortious interference with prospective economic advantage may not be maintained under South Carolina law.

Mijanovich. Accordingly, unless the exclusive contract with Dr. Mijanovich is unlawful—which is plainly not the case—defendants' diversion of requests to Dr. Mijanovich was justified as a matter of law.[42]

■ Plaintiffs have also alleged two separate claims for breach of contract (Counts IX and X) based on defendants' alleged termination of plaintiffs' staff privileges without good cause. In Count IX, plaintiffs allege that they were third party beneficiaries under the Lease Agreement entered into between defendants and Cherokee County and that defendants breached their obligation undertaken in Section 3.1 of the Lease Agreement that they would not terminate plaintiffs' staff privileges without good cause. In Count X, plaintiffs allege that the bylaws of the medical staff constitute a contract between plaintiffs and defendants and that defendants violated their obligation under the bylaws not to terminate plaintiffs' staff privileges without good cause. In order to prevail on either of these claims, plaintiffs must first show that defendants' decision not to renew plaintiffs' pathology contract actually constituted a revocation of plaintiffs' medical staff privileges. This Court has already concluded in its discussion of plaintiffs' claim under 42 U.S.C. § 1983 that defendants' decision not to renew plaintiffs' pathology contract had no impact at all on plaintiff's medical staff privileges.[43]

42. A similar claim under Illinois law was considered and rejected by the *Collins* court. There, the plaintiff pathologist claimed that the defendants had tortiously interfered with his medical staff privileges. After finding that the plaintiff's staff privileges had not, in fact, been reduced, because the exclusive pathology contract at issue was valid under federal and state antitrust laws, the court granted summary judgment for defendants on the tortious interference claim. Specifically, *Collins* noted:

> Because the Court has found that the agreement was legal and did not violate antitrust laws, the Plaintiff cannot argue that the parties to the agreement committed a tort by adhering to the terms of that agreement. The Court finds that even if the Defendants had caused [the hospital] to comply with the agreement by not hiring [the plaintiff pathologist], such action was taken pursuant to a lawful agreement and cannot form the basis for [plaintiff's] claim that [the defendants] interfered with [plaintiff's] staff privilege because he was refused future employment at the Hospital.

*Collins,* Slip Op. at A–52.

43. *Collins* provides further support for this Court's conclusion that plaintiffs have not been deprived of their medical staff privileges as a result of defendants' decision not to renew their pathology contract. The plaintiff in *Collins* likewise alleged that the defendant hospital "did not comply with the bylaws of the hospital when they substantially removed or reduced [plaintiffs'] staff privileges in pathology by preventing him from practicing pathology in the pathology laboratory." (Slip Op. at A–49). In accepting the hospital's argument that "[plaintiff] was not entitled to any type of procedure regarding his staff privileges, because the Hospital never removed or reduced the Plaintiff's staff privileges", *id.,* the *Collins* Court noted:

> A hospital requires that a physician have staff privileges at its facility as a means of insuring that a doctor is qualified to practice in his

profession and that the hospital will fulfill its public service function of delivering quality medical services to its patients. [Plaintiff] was not entitled to be employed by the Hospital simply because the Hospital had granted him staff privileges, even if the Hospital would not have employed him had he not had staff privileges. A hospital's decision to grant or deny staff privileges is based upon the qualifications of the physician, and a hospital is not required to employ everyone to whom it has granted staff privileges.

> In the present case, [plaintiff] is asserting that because St. John's Hospital had granted him staff privileges, he was entitled to practice pathology in the Hospital's pathology laboratory, using the Hospital's laboratory equipment. However, St. Johns' Hospital declined to hire [plaintiff] because they already had a contractual arrangement with APL for the provision of all of their pathology services. The Hospital never made an issue out of Dr. Collins' qualifications to practice pathology, which would have been the real issue at a hearing involving the reduction or removal of his staff privileges. Dr. Collins maintains his staff privileges at St. John's Hospital at the current time under a leave of absence status; because the Hospital never reduced or removed his staff privileges, there was no issue or dispute about his qualifications which a hearing and other procedures in the by-laws could have addressed. It is true that [plaintiff] has been refused employment by St. John's Hospital, but this is due to the contract between the Hospital and APL and cannot be characterized as a reduction or removal of staff privileges which would require the procedural protections written into the Hospital's by-laws. The Court orders summary judgment in favor of the Defendants on Count IX.

*Collins,* slip op. at A–50.

It is thus clear, without even reaching the question whether plaintiffs are third party beneficiaries under the Lease Agreement or whether the bylaws constitute an enforceable contract between plaintiffs and defendants, that plaintiffs cannot prevail on either of these claims and that defendants are entitled to summary judgment.